# IN THE SUPREME COURT OF IOWA

No. 57 / 04-0434

Filed September 15, 2006

**ARTHUR YATES, BEVERLY YATES, and YATES KENNEL, INC.**,

Appellees,

vs.

**IOWA WEST RACING ASSOCIATION d/b/a BLUFFS RUN CASINO, and HARVEY'S BLUFFS RUN MANAGEMENT COMPANY, INC.**,

Appellants.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Pottawattamie County, Jeffrey L. Larson and Timothy O'Grady, Judges.

Defendants appeal from adverse jury verdict on claims of defamation and negligence; Plaintiffs cross appeal from district court's refusal to submit punitive damages on their negligence claim. **COURT OF APPEALS DECISION AFFIRMED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED WITH DIRECTIONS.**

Donald J. Pavelka, Jr., and Thomas M. Locher of Locher Pavelka Dostal Braddy & Hammes, LLC, Omaha, Nebraska, for appellants.

Jerry Crawford and Jim Quilty of Crawford Law Firm, Des Moines, for appellees.

**LAVORATO, Chief Justice.**

This action arises out of the defendants' alleged slanderous statements about a greyhound kennel and the defendants' alleged negligence in maintaining its track that allegedly resulted in injuries to the kennel's racing dogs. The defendants appealed from an adverse jury verdict on both claims. The kennel cross appealed, contending that the district court erred in not submitting punitive damages on its negligence claim.

We transferred the case to the court of appeals, which reversed on the appeal, concluding that the district court erred in overruling the defendants' motion for directed verdict on both the slander and negligence claims. Because of its decision on the negligence claim, the court of appeals did not address the cross-appeal.

The kennel filed an application for further review, which we granted. We affirm the court of appeals decision, reverse the district court judgment, and remand the case with directions.

**I. Background Facts.**

Arthur and Beverly Yates are the owners of Yates Kennel, Inc., an Iowa corporation. Yates Kennel is a greyhound racing dog kennel that operated at Bluffs Run Casino (BRC) in Council Bluffs, Iowa. Iowa West Racing Association (IWRA) is a non-profit corporation and an Iowa statutory dog track licensee. IWRA is the owner of the license to operate Bluffs Run Casino. Harveys BR Management Company, Inc. (Harveys), a Nevada corporation, manages Bluffs Run pursuant to a management agreement with IWRA.

In 1998, 1999, and 2000, Yates Kennel obtained booking contracts with Harveys to have its greyhound dogs participate in greyhound racing meets at Bluffs Run. In 1999 and 2000, there was an increase in the number of injuries and deaths of greyhounds while racing at Bluffs Run. A

number of those casualties were to Yates Kennel dogs. Kennel owners, including the Yates, thought the injuries and deaths resulted from the track being too hard in some spots and too soft in other spots.

In 2000 the Yates heard rumors that its kennel would not receive a booking contract for 2001. On November 16, 2000, the Iowa Racing and Gaming Commission (Commission), a state agency that regulates racing in Iowa, held a meeting. Jerry Crawford, an attorney for the Iowa Greyhound Association (IGA), an organization of kennel owners and operators, spoke at that meeting. At the time, Beverly Yates was a director of IGA. In relevant part regarding injuries to the racing greyhounds, the minutes of that meeting reflect the following:

> Chair Hansen called on the Iowa Greyhound Association (IGA). Jerry Crawford, legal counsel for the IGA, advised they requested the opportunity to appear before the Commission to discuss the contractual ramifications of the track condition at Bluffs Run Casino (BRC), and more specifically, the contracts between BRC and the kennel owners/operators. He stated that some individuals would consider this to be a private matter between the track as a business and third parties, but feels that thought process ignores the Commission's responsibility as BRC is a regulated business entity. He pointed out that the Commission determines the amount of money BRC is required to pay in purses to the third party kennel operators. Additionally, the Commission is responsible for monitoring the safety of the track conditions at the facility. Mr. Crawford stated that the track condition has been better on some occasions than others, but that it is not necessary to go back any further than the Commission meeting in Clinton when Verne Welch, BRC's general manager, stated that two track records had been set in a one-week period. He indicated the Commission should be concerned as that means the track surface is like asphalt, making it very dangerous for the greyhounds. If the track surface is endangering the safety of the greyhounds, it is creating enormous financial and practical problems for the kennel owners and operators. Mr. Crawford stated that greyhounds are very expensive, and it is difficult for the owners/operators to maintain an active list when they are injuring dogs at a record rate. They are also faced with the economic hardship of replacing those dogs.

As the minutes reflect, Crawford then got into the question of kennel contracts for the year 2001:

> At this point, all IGA knows is that some BRC kennel operators have not received a contract for the coming year. Mr. Crawford informed the Commission that the Arthur and Beverly Yates Kennel is one of the operators that has not received a contract offer for 2001. He noted that the Yates kennel has experienced 20 broken legs so far in 2000, and has had between 10-15 additional greyhounds removed from racing due to other race-ending injuries. In terms of dollars won, they are second from the bottom. This year money won in stakes' races were not included in kennel standings, which is a variation from previous years. Mr. Crawford stated that the Yates Kennel did very well in stake races, noting that they had two dogs in the final Iowa Breeders Championship Race. He noted that one of the owners is an officer of the IGA, and BRC has indicated they are critical of them on the topic of the track condition.

> Crawford then requested the Commission to

> establish a timetable in order to review this matter to determine fairness due to the various issues faced by the kennel operators at BRC. He stressed to the Commissioners that it is the members of IGA, the kennel owners/operators, breeders and trainers, who have suffered the entire financial consequence of what has happened at BRC this year. He questioned whether the Commission should allow these small Iowa-based businesses to suffer the additional financial consequence of being put out of business at BRC.

Crawford asked the Commission to stop the execution of contracts so that "a fair and equitable dismissal clause" that ensures competent performance could be worked out. He also asked that the Commission "not allow BRC to do whatever it chooses to do with regard to kennel contracts."

The Commission then allowed individuals with an opposing view an opportunity to speak. Lyle Ditmars, legal counsel for BRC, responded to the various issues Crawford raised. On one of those issues, timing of the kennel contracts, the minutes reflect that Ditmars stated the following:

> Mr. Ditmars stated the timing is the same as last year. BRC established a committee that reviewed several criteria in determining who would be offered contracts: ranking of the kennel by number of wins; win percentage; compliance with

contract requirements regarding the active list; compliance with contract requirements regarding the number of active greyhounds classified as A and B; residency of the owner; and contracts with the state of Iowa. He noted there have been instances where the kennel operators resided in Iowa, but did not have any Iowa-bred greyhounds in the kennel. Other factors are the willingness of the operator to use Iowa-bred greyhounds; quality of greyhounds maintained throughout the year; participation by the kennel operator in activities and programs designed to promote, enhance and improve greyhound racing at BRC; whether the kennel operator participated in activities that are potentially harmful to the operation of racing at BRC or other kennel operators; and the kennel operator's compliance with other contract requirements.

Ditmars then made the following comments about the Yates Kennel:

Mr. Ditmars stated that BRC does not discuss who will or will not get a kennel contract with other kennel operators. Mr. Ditmars confirmed that the Yates Kennel was not offered a contract for 2001, and will not be offered one. In 1999 the kennel was in the bottom two or three kennels in terms of performance. They were given a six-month contract. At the end of that contract, even though they remained in the bottom five, they were given an additional six-month contract to give them an opportunity to correct the situation. At this time, the Yates Kennel is second from last in terms of wins and third from the bottom in terms of win percentage for the year. Mr. Ditmars stated that the decision was not arbitrarily made. He noted that Ms. Yates was on the board of directors of the IGA when they were offered their first kennel contract; Jason Hines was the president of IGA when he was offered a contract; and Bob Rider, who has had two six-month contracts and addressed the Commission regarding issues at BRC last year, was offered a new contract for 2001.

Additionally, in response to a commissioner's question, Ditmars reportedly stated that he denied that any of the criteria established to determine which kennels would be offered contracts for next year were based on retribution for voicing criticism regarding BRC. According to the minutes, Crawford made a number of comments in rebuttal to Mr. Ditmars comments. One such comment included the following: "Mr. Crawford questioned the reasons given for terminating the Yates Kennel when kennels ranked lower than them received contracts for 2001, and over half

of the kennels consistently have less than the required number of greyhounds on the active list."

In response to this last comment, the minutes show that Ditmars stated the following: "Mr. Ditmars reiterated that the Yates Kennel is second from last in the kennel standings. The kennel in last place did not receive a six-month contract in the previous year, as did the Yates Kennel due to poor performance in 1999."

According to the minutes, the Commission took no action on Crawford's request. One commissioner "noted that the agenda stated it was to be a discussion of the contractual and financial ramifications of track conditions at BRC." Another commissioner stated that "BRC is a private commercial company contracting with other private commercial companies" and she "could not foresee the Commission getting involved unless something unsavory was taking place." Newspaper reporters present during the meeting wrote newspaper accounts containing some of Ditmars' statements about Yates Kennel.

## II. Proceedings.

Six months later, the Yates and Yates Kennel (hereinafter collectively referred to as plaintiffs) sued IWRA and BRC (hereinafter collectively referred to as defendants), alleging a number of theories for recovery, only two of which are relevant to this appeal: slander per se and negligence. As to both theories, the plaintiffs sought compensatory and punitive damages. The plaintiffs alleged that Ditmars' statements before the Commission were slanderous per se. The plaintiffs also alleged that the defendants' negligence in maintaining the dog track caused injuries to its dogs for which it suffered damages.

The parties tried the case to a jury, and the district court submitted for the jury's consideration the slander and negligence claims as well as

punitive damages on the slander claim. The court refused to submit punitive damages on the negligence claim. On the slander claim, the jury awarded no compensatory damages but did award punitive damages.

On the negligence claim, the jury found the plaintiffs thirty-three percent at fault and the defendants sixty-seven percent at fault. The jury awarded damages for loss of income, lost value of injured greyhounds, and veterinary expenses.

The defendants appealed both the slander and negligence verdicts. The plaintiffs cross-appealed, contending the district court erred in not submitting punitive damages on their negligence claim. We transferred the case to the court of appeals. The court of appeals reversed on the appeal. Because the court of appeals reversed on the appeal, it did not address the cross-appeal.

We granted the plaintiffs' application for further review.

### III.  Issues.

Although a number of issues were raised on appeal, we determine that only the following issues require discussion: whether the district court erred in denying the defendants' motion for directed verdict in which the defendants asserted that (1) the alleged slanderous statements in question were true as a matter of law and (2) there was insufficient evidence that the track conditions proximately caused injuries to the plaintiffs' dogs.

### IV.  Scope of Review.

We review the district court's rulings on motions for directed verdict for correction of errors at law. *Estate of Pearson ex rel. Latta v. Interstate Power & Light Co.,* 700 N.W.2d 333, 340 (Iowa 2005). In reviewing such rulings, we view the evidence in the light most favorable to the nonmoving party to determine whether the evidence generated a fact question. *Dettmann v. Kruckenberg,* 613 N.W.2d 238, 250-51 (Iowa 2000). To

overcome a motion for directed verdict, substantial evidence must exist to support each element of the claim or defense. *Id.* at 251. Substantial evidence exists if reasonable minds could accept the evidence to reach the same findings. *Id.*

### V. The Defamation Claim: Truth as a Defense.

The first issue we address is whether the district court erred in overruling the defendants' motion for directed verdict on the ground that the alleged slanderous statements were true as a matter of law.

**1. Applicable law.** The law of defamation includes the twin torts of libel and slander. *Schlegel v. The Ottumwa Courier*, 585 N.W.2d 217, 221 (Iowa 1998). "Libel is generally a written publication of defamatory matter, and slander is generally an oral publication of such matter." *Id.* (citation omitted). As we noted in *Schlegel*,

> "[t]he law of defamation embodies the public policy that individuals should be free to enjoy their reputation unimpaired by false and defamatory attacks. An action for defamation or slander is based upon a violation of this right.
>
> The gravamen or gist of an action for defamation is damage to the plaintiff's reputation. It is reputation which is defamed, reputation which is injured, and reputation which is protected by the law of defamation.
>
> Defamation is an impairment of a relational interest; it denigrates the opinion which others in the community have of the plaintiff and invades the plaintiff's interest in the [plaintiff's] reputation and good name."

*Id.* (quoting 50 Am. Jur. 2d *Libel and Slander* § 2, at 338-39 (1995)).

In *Hovey v. Iowa State Daily Publication Board, Inc.*, we adopted "the view espoused in Restatement (Second) of Torts, section 581A comment *f* that if an allegedly defamatory statement is substantially true, it provides an absolute defense to an action for defamation." 372 N.W.2d 253, 256 (Iowa 1985). Comment *f* provides that

many charges are made in terms that are accepted by their recipients in a popular rather than a technical sense. . . .

It is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided the defamatory charge is true in substance.

Restatement (Second) of Torts § 581A cmt. *f* (1977).

Prior to *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990), as a matter of constitutional law, a statement of opinion was thought not to be defamatory. As the United States Supreme Court stated in *Gertz v. Robert Welch, Inc.*,

> [u]nder the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in "uninhibited, robust, and wide-open debate" on the public issues. They belong to that category of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality."

418 U.S. 323, 339-40, 94 S. Ct. 2997, 3007, 41 L. Ed. 2d 789, 805 (1974) (citations omitted); *accord Jones v. Palmer Commc'ns, Inc.*, 440 N.W.2d 884, 891 (Iowa 1989) ("Opinion is absolutely protected under the first amendment."), *overruled on other grounds by Schlegel*, 585 N.W.2d at 224.

This statement in *Gertz* was dictum; however, a majority of the federal courts of appeals interpreted this dictum to mean that statements of fact can be actionable defamation but statements of opinion cannot. *Guilford Transp. Indus., Inc. v. Wilmer*, 760 A. 2d 580, 596 (D.C. 2000). As one court observed,

> [b]y this statement, *Gertz* elevated to constitutional principle the distinction between fact and opinion, which at common law had formed the basis of the doctrine of fair comment. *Gertz*'s implicit command thus imposes upon state and federal courts the duty as a matter of constitutional adjudication to

distinguish facts from opinions in order to provide opinions with the requisite, absolute First Amendment protection.

*Ollman v. Evans*, 750 F.2d 970, 975 (D.C. Cir. 1984) (footnotes omitted). The framework of analysis was therefore to determine whether the alleged defamatory statement was fact or opinion.

Because the degree to which alleged defamatory statements have real factual content can vary greatly, the court in *Ollman* noted "that courts should analyze the totality of the circumstances in which [such] statements are made to decide whether they merit the absolute First Amendment protection enjoyed by opinion." *Id.* at 979. In evaluating the totality of the circumstances, the court considered four factors in assessing whether the average reader or listener, in contrast to the most skeptical or most credulous reader or listener, would view the statement as fact or opinion. *Id.* at 979 & n.16. These factors, the court was convinced, would lead to "a proper accommodation between the competing interests in free expression of opinion and in an individual's reputation." *Id.* at 978.

Following the lead of many other federal circuit courts of appeals, the eighth circuit adopted this four-factor test in *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302 (8th Cir.), *cert. denied,* 479 U.S. 883, 107 S. Ct. 272, 93 L. Ed. 2d 249 (1986). Relying on *Janklow,* we adopted the four-factor test in *Palmer Communications, Inc.*, 440 N.W.2d at 891-92.

The first relevant factor is whether the alleged defamatory statement "has a precise core of meaning for which a consensus of understanding exists or, conversely, whether the statement is indefinite and ambiguous." *Ollman*, 750 F.2d at 979; *see also Palmer Commc'ns, Inc.*, 440 N.W.2d at 891. We characterized this factor as "the precision and specificity of the disputed statement." *Palmer Commc'ns, Inc.*, 440 N.W.2d at 892 (citation omitted).

The second relevant factor is "the degree to which the [alleged defamatory] statements are . . . objectively capable of proof or disproof []." *Ollman*, 750 F.2d at 981. We related this factor to the first factor and noted that "if a statement is precise and easy to verify, it is likely the statement is fact." *Palmer Commc'ns, Inc.*, 440 N.W.2d at 891. In this connection, one writer has defined a factual statement as one that relates to an event or state of affairs that existed in the past or exists at present and is capable of being known. *See Ollman*, 750 F.2d at 981 n.22 (citation omitted). This verification factor "is, in actuality, merely one of many rules in tort that prevent the jury from rendering a verdict based on speculation." *Id.* at 981.

The third relevant factor is the context in which the alleged defamatory statement occurs. *Id.* "[T]he context to be considered is both narrowly linguistic and broadly social." *Id.* We characterized this factor as "the 'literary context' in which the disputed statement [is] made." *Palmer Commc'ns, Inc.*, 440 N.W.2d at 891. The degree to which a statement is laden with factual content or can be read to imply facts depends upon the article or column, *see id.*, or in this case the whole discussion.

The last relevant factor is "the broader social context into which [the alleged defamatory] statement fits." *Ollman*, 750 F.2d at 983. Important here are the types of writing or speech in which the statement appears. *Id.* We likewise characterized this factor as "the social context," and noted that this factor "focuses on the category of publication, its style of writing and intended audience." *Palmer Commc'ns, Inc.*, 440 N.W.2d at 891-92 (citation omitted). We also noted that we consider the "'public context' or political arena in which the statements were made." *Id.* at 892 (citations omitted).

In 1990 the Court in *Milkovich* rejected this per se approach providing blanket First Amendment protection of all statements of opinion:

> [W]e do not think this passage from *Gertz* [quoted above] was intended to create a wholesale defamation exemption for anything that might be labeled "opinion" . . . . Not only would such an interpretation be contrary to the tenor and context of the passage, but it would also ignore the fact that expressions of "opinion" may often imply an assertion of fact.

497 U.S. at 18, 110 S. Ct. at 2705, 111 L. Ed. 2d at 17.

Noting that the *Gertz* dictum "ignored the fact that expressions of 'opinion' may often imply an assertion of fact," the Court gave the following example to support this statement:

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

*Id.* at 18-19, 110 S. Ct. at 2705-06, 111 L. Ed. 2d at 17-18.

Citing existing law, the Court clarified that only statements regarding matters of public concern that are not sufficiently factual to be capable of being proven true or false and statements that cannot reasonably be interpreted as stating actual facts are absolutely protected under the Constitution. In making this clarification, the Court rejected "the creation of an artificial dichotomy between 'opinion' and fact." *Id.* at 19-20, 110 S. Ct. at 2705-06, 111 L. Ed. 2d at 18. In rejecting this dichotomy, the Court did not, however, abolish the constitutional protection for opinions. It merely narrowed that protection. *Hunt v. Univ. of Minn.*, 465 N.W.2d 88, 94 (Minn. Ct. App. 1991). Thus, the framework of analysis is no longer whether the alleged defamatory statement is fact or opinion. Rather the framework of analysis now is whether the alleged defamatory statement can reasonably be interpreted as stating actual facts and whether those facts

are capable of being proven true or false. Under this analysis, "statements of opinion can be actionable if they imply a provable false fact, or rely upon stated facts that are provably false." *Moldea v. New York Times Co.,* 22 F.3d 310, 313 (D.C. Cir. 1994). The statement that the plaintiff must prove false is not the literal wording of the statement but what a reasonable reader or listener would have understood the author to have said. *Milkovich,* 497 U.S. at 16-17, 110 S. Ct. at 2704-05, 111 L. Ed. 2d at 16.

Although the Court in *Milkovich* rejected the dichotomy between fact and opinion as the framework of analysis, we agree with the following:

> The test used in *Milkovich* to identify protected opinions is very similar to the four-factor inquiry used by the circuit courts to distinguish fact from opinion. Specificity and variability are closely related to whether the statement is capable of being proven false. Whether a remark can be reasonably interpreted as stating actual facts must be inferred from the political, literary, and social context in which the statement was made. Given the similarity between the Supreme Court's definition of protected opinion and the circuit courts' fact/opinion analysis, decisions applying the *Janklow* test are still helpful under *Milkovich.*

*Hunt,* 465 N.W.2d at 94; *see also Milkovich,* 497 U.S. at 24-25, 110 S. Ct. at 2709, 111 L. Ed. 2d at 21-22 (Brennan, J., dissenting) (agreeing with the majority's statement of the law but disagreeing with the majority's application of the law to the facts; also noting that among the circumstances a court is to consider in determining whether a statement purports to state or imply actual facts about an individual are the same four factors used to distinguish between statements of fact and statements of opinion first stated in *Ollman* and adopted in *Janklow*). We will therefore employ the four-factor test we adopted in *Palmer Communications, Inc.* to identify protected opinion under the *Milkovich* framework of analysis.

A trial court's initial task in a defamation action is to decide whether the challenged statement is "capable of bearing a particular meaning, and

whether that meaning is defamatory." Restatement (Second) of Torts § 614(1) (1977); *see also Levy v. Am. Mut. Ins. Co.,* 196 A.2d 475, 476 (D.C. 1964) ("It is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule, as a matter of law, that it was not libelous."). In carrying out this task, a court should not, however,

> indulge far-fetched interpretations of the challenged publication. The statements at issue "should . . . be construed as the average or common mind would naturally understand [them]." If the court determines that a statement is indeed capable of bearing a defamatory meaning, then whether that statement is in fact "defamatory and false [is a question] of fact to be resolved by the jury."

*Guilford Transp. Indus.,* 760 A.2d at 594 (citations omitted).

**2. The merits.** As mentioned, minutes of the Commission meeting on November 16, 2000 reflect that attorney Crawford questioned the reasons given for terminating the Yates Kennel when kennels ranked lower than it received contracts for 2001, and over half of the kennels consistently had less than the required number of greyhounds on the active list. The minutes further reflect that in responding to this comment, attorney Ditmars stated the following: "Yates Kennel is second from last in the kennel standings. The kennel in last place did not receive a six-month contract in the previous year, as did the Yates Kennel due to poor performance in 1999."

Beverly Yates testified Ditmars' statement that "Yates Kennel is second from last in kennel standings" was true. She further testified over hearsay objections that she read newspaper accounts of the Commission meeting stating that Yates Kennel had a poor, noncompetive kennel.

David Ungs testified that he was president of the IGA at the times material to this action. Ungs further testified that in his capacity as president he met with Vern Welch, a representative of Bluffs Run management, some time before the commission meeting on November 16, 1999. In his conversation with Welch, Ungs stated he and Welch discussed the possibility of kennels losing their booking contracts. According to Ungs, Welch stated that Bluffs Run was one of the leading tracks in the country as far as payouts were concerned and that the kennels would need to be more competitive or they would be eliminated. Later at the Commission hearing on November 16, which Ungs attended, Ungs learned that the Yates Kennel's booking contract would not be renewed. He recalled that at the November 16 meeting Ditmars said that Yates Kennel did not receive a booking contract because they were a "substandard or lower kennel."

The plaintiffs contend that the references to Yates Kennel as "substandard and poor performers" as testified to by Beverly Yates and David Ungs were defamatory. For reasons that follow, we disagree.

The issue boils down to whether the Ditmars statement "substandard and poor performers," which is an opinion, implies a provably false fact, or relies upon stated facts that are provably false. Viewing this statement in context, we first note that Ditmars' statement was in response to Crawford's questioning of the reasons given for terminating the kennel's booking contract. Ditmars set out facts (the kennel's ranking compared to other kennels), which signaled to a reasonable listener that his statement "poor and substandard performers" represented a characterization of those facts.

Moreover, "substandard and poor performers" do not have a precise and verifiable meaning and are therefore less likely to give rise to clear factual implications. But even if the words "substandard" and "poor performers" are verifiable, that assessment is supported by stated facts that

are true. *Cf. Moldea*, 22 F.3d at 317 (Assuming statement, contained in review of book reporting on alleged gang connections with professional football, that author had engaged in "too much sloppy journalism," was capable of verification, statement was not defamatory because book review author had supported statement with illustrations from book itself). Ditmars' disclosure of the facts underlying his statement of "substandard and poor performers," facts that Beverly Yates conceded were true, makes this case different from *Milkovich.* A reasonable reader could conclude that Ditmars was giving his personal conclusion or opinion about those undisputed facts. The reader could further conclude that Ditmars' statement did not imply any provable false fact. *See Phantom Touring, Inc. v. Affiliated Publ'ns,* 953 F.2d 724, 731 & n.13 (1st Cir. 1992) (Newspaper articles that allegedly falsely accused touring company of deliberate effort to pass off its musical-comedy version as widely acclaimed Broadway show of same name did not constitute actionable defamation because assertion of deceit reasonably could have been understood not as a statement of fact but only as reporter's personal conclusion about information that was presented which was not challenged as false.).

A good example of a statement with a well-defined meaning is an accusation of a crime. *See, e.g., Cianci v. New York Times Publ'g Co.*, 639 F.2d 54, 63 (2d Cir. 1980) (holding that an article that implied a mayor had committed rape and that charged him with paying the alleged victim not to bring charges was not protected opinion). Clearly, an accusation of a crime is laden with factual content and the facts are easily verifiable. Such was the case in *Milkovich.* In that case a high school wrestling coach argued that an Ohio newspaper libeled him by printing a column that alleged he had perjured himself in his testimony to a state court concerning his role in an altercation between his team and an opposing team at a wrestling

match.  The column stated that "Anyone who attended the meet . . . knows in his heart that Milkovich . . . lied at the hearing . . . ." *Milkovich*, 497 U.S. at 5, 110 S. Ct. at 2698, 111 L. Ed. 2d at 9.  The Court rejected the argument that an accusation of perjury was nonactionable merely because it was offered as the writer's opinion.  *Id.* at 21, 110 S. Ct. at 2707, 111 L. Ed. 2d at 19.  The Court noted that "the connotation that the petitioner committed perjury is sufficiently factual to be susceptible of being proved true or false . . . . 'Unlike a subjective assertion the averred defamatory language is an articulation of an objectively verifiable event.' " *Id.* at 21-22, 110 S. Ct. at 2707, 111 L. Ed. 2d at 19 (citation omitted).

For all of these reasons, we conclude as a matter of law that the statement "substandard and poor performers" constituted nothing more than Ditmars' conclusion or opinion, which contained nothing that implied any provable false fact.  Moreover the statement was based on facts that were true.  As such the statement was not defamatory.

**VI.  The Negligence Claim:  Sufficiency of the Evidence Regarding Causation.**

The second issue we address is whether the district court erred in overruling the defendants' motion for directed verdict because there was insufficient evidence that the track conditions proximately caused injuries to the plaintiffs' dogs.  In their motion for directed verdict, the defendants contended the plaintiffs did not prove that the injuries to the dogs would not have occurred but for the defendants' maintenance of the track.  In support of their contention, the defendants argued the plaintiffs did not produce testimony that a qualified veterinarian examined or treated any of the plaintiffs' dogs at the time they were allegedly injured and diagnosed them with injuries attributable to track conditions.  At the close of all the

evidence, the defendants renewed their motion. The defendants raised the same contention and arguments on appeal.

**1. Applicable law.** To sustain its negligence claim against the defendants, the plaintiffs had to prove that the defendants owed it a duty of care, they breached that duty, their breach was the actual and proximate cause of the injuries to its dogs, and the damages it suffered. *Virden v. Betts & Beer Constr. Co.*, 656 N.W.2d 805, 807 (Iowa 2003).

> As we explained in *Berte v. Bode*,
>
> Causation has two components: "(1) the defendant's conduct must have *in fact caused* the plaintiff's damages (generally a factual inquiry) and (2) the policy of the law must require the defendant to be *legally responsible* for the injury (generally a legal question). We apply a "but for" test to determine whether the defendant's conduct was a cause in fact of the plaintiff's harm. Under that test, "the defendant's conduct is a cause in fact of the plaintiff's harm, if, but-for the defendant's conduct, that harm would not have occurred. The but-for test also implies a negative. If the plaintiff would have suffered the same harm had the defendant not acted negligently, the defendant's conduct is not a cause in fact of the harm."

692 N.W.2d 368, 372 (Iowa 2005) (citations omitted). Proximate cause or legal cause, the second element of causation, determines the appropriate scope of a negligent defendant's liability. In applying proximate cause rules, courts attempt "to discern whether, in the particular case before the court, the harm that resulted from the defendant's negligence is so clearly outside the risks he created that it would be unjust or at least impractical to impose liability." *Id.* (citation omitted). Here, we are dealing with cause in fact.

This court has long been "committed to a liberal rule [that] allows opinion testimony if it is of a nature which will aid the jury and is based on special training, experience, or knowledge [as] to the issue in question." *Iowa Power & Light Co. v. Stortenbecker*, 334 N.W.2d 326, 330 (Iowa 1983). However, medical testimony regarding whether an accident caused an injury is not within the knowledge and experience of ordinary laypersons.

*Bradshaw v. Iowa Methodist Hosp.*, 251 Iowa 375, 382-83, 101 N.W.2d 167, 171 (1960) (holding that in patient's action for personal injury allegedly resulting from a fall in defendant hospital, medical testimony that it was possible that plaintiff's subsequent physical condition was caused by the fall was insufficient, standing alone, to take the issue of causation to the jury).  Such testimony is essentially within the domain of testimony from a medical expert.  *Id.* at 383, 101 N.W.2d at 171.  Before such testimony can be considered competent, there must be sufficient data upon which the expert judgment can be made.  The facts must be sufficient to allow the expert to reach a conclusion that is "more than mere conjecture or speculation."  *Stortenbecker*, 334 N.W.2d at 330-31.  Without the medical testimony, a jury is left to resort to conjecture in determining causation.  *Chenoweth v. Flynn,* 251 Iowa 11, 16, 99 N.W.2d 310, 313 (1959).  The rule is the same with respect to injuries to animals.  *See Winter v. Honeggers' & Co.,* 215 N.W.2d 316, 323 (Iowa 1974) (holding veterinarian testimony that the negligent design of a hog confinement facility possibly caused an illness to hogs coupled with testimony that the hogs were not affected with the illness before the use of the facility was sufficient on the question of causation); *Miller v. Economy Hog & Cattle Powder Co.,* 228 Iowa 626, 636-37, 293 N.W. 4, 9 (1940) (holding that, in suit for damages for death of sheep allegedly caused by feeding a product purchased from defendant, testimony from several veterinarians who examined the sheep on various occasions and who also made a number of post mortem examinations was sufficient on causation).

> As this court in *Hildebrand & Son v. Black Hawk Oil Co.* noted,
>
> the plaintiff is bound, as a necessary element of its case, to show that the injuries which its hogs suffered were the direct result of the feeding of this preparation to them.  There is no expert testimony introduced in this case, there seems to have

been no post mortem of the dead hogs, and there is no testimony directed to the point that the injury to this herd of hogs was the result of the feeding of the preparation to them. It is also to be remembered in cases of this character that in the course of events all animals die; in other words death is inherent in all animal creation. Equally so all animal creation is subject to many ailments, ills, and diseases, resulting in death or injury to the animal. Therefore, in a case of this kind, proof that the animal died or was permanently injured does not establish a case for the plaintiff. In short, plaintiff alleges that these hogs died and injury to the balance of the herd was caused by the feeding of this preparation to them. Plaintiff is bound to prove this else it has not made out a case. The evidence is wholly wanting to connect the death of these hogs with the feeding of this preparation, and equally so as to their stunted growth.

205 Iowa 946, 947-48, 219 N.W. 40, 40-41(1928) (citation omitted).

**2. Analysis.** The plaintiffs produced three witnesses concerning the dogs' injuries. Lori Fortune, an assistant dog trainer, testified that her training included identifying injuries and the cause of injuries to the dogs. She further testified that her training indicated to her what may have caused the injuries. She explained that in her experience a track that has inconsistent surfaces, such as Bluffs Run had, varying between hard and soft spots, can injure dogs. Hard spots she said could cause broken bones and loose spots could cause muscle and ligament damage. Over defendants' objection that the witness was not qualified to testify concerning causation of the dogs' alleged injuries, the witness was allowed to give her opinion that the majority of the injuries to the plaintiffs' dogs came from poor track conditions.

Randy Schaben testified that he raised greyhounds. Like Fortune, Schaben described the Bluffs Run track in 2000 as having an inconsistent surface—there were hard and soft spots on the surface of the track. He described the inconsistency this way: "The easiest way to probably explain it would be like running from a grassy lawn onto a sidewalk and then back

into grass . . . . It's just inconsistent footing, so to speak." He further testified that in 2000 his dogs suffered a lot of injuries at the track.

James Lovely, a dog trainer who also raced greyhounds, testified that for a period of sixty and ninety days there were more dog injuries at Bluffs Run than there should have been. Although he was not sure what was causing so many injuries, his personal opinion was that there was a hard pan directly under the surface of the track.

The plaintiffs also produced evidence from engineers who tested the soil on the track and who confirmed that the track conditions went from hard to soft, conditions that could be "aggressive on a dog's paws."

Beverly Yates, one of the owners of Yates Kennel, testified that the kennel was claiming damages for injuries to twenty-four dogs for the year 2000. A list of the dogs and their injuries is included in an exhibit in evidence. However, there was no medical testimony that attributed the cause of those injuries to race track conditions. This failure of proof was fatal to Yates Kennel's negligence claim. Fortune's testimony attributing the cause of a majority of the injuries to the track conditions was conjecture and therefore not sufficient to overcome this flaw.

We agree with the defendants that evidence of increased injuries to dogs for a period of time was anecdotal, at best. Moreover, Fortune admitted that many other factors can account for injuries to greyhounds. These factors, she admitted, include genetics, conditioning, accidents at the kennel or while the dogs are being transported, dogs bumping into each other during the races, dogs racing while already injured, and the natural effects of racing on the body of a dog. Fortune conceded that the exhibit listing the injuries had no reference to track conditions but did have references to dogs falling and making contact with other dogs. A veterinarian called by the defendants confirmed that there are numerous

causal factors related to greyhound injuries including genetics, where and how the dog was reared, nutrition, physical conditioning, type of competition, and a dog racing without adequate rest or with injury.

**VII. Disposition.**

In sum, we conclude as a matter of law that the plaintiffs failed to produce sufficient evidence of their slander and negligence claims for submission of those claims to the jury. Accordingly, the district court erred in overruling the defendants' motion for directed verdict. We therefore affirm the court of appeals decision and reverse the judgment of the district court. We remand for entry of a judgment in favor of the defendants.

**COURT OF APPEALS DECISION AFFIRMED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED WITH DIRECTIONS.**

All justices concur except Larson, J., who takes no part.