# IN THE COURT OF APPEALS OF IOWA

No. 15-2105
Filed May 3, 2017

**TAMARA STELLMACH and JOHN STELLMACH,**
Plaintiffs-Appellants,

**vs.**

**STATE OF IOWA d/b/a UNIVERSITY OF IOWA HOSPITALS AND CLINICS,**
Defendant-Appellee.
_____

Appeal from the Iowa District Court for Johnson County, Marsha A. Bergan, Judge.

Tamara and John Stellmach appeal from the jury's adverse verdict in their action for medical malpractice. **AFFIRMED.**

James K. Weston II of Tom Riley Law Firm, Iowa City, for appellants.

Thomas J. Miller, Attorney General, and Anne Updegraff, Assistant Attorney General, for appellee.

Pope S. Yamada and Richard M. Tucker of Phelan, Tucker, Mullen, Walker, Tucker & Gelman, L.L.P., Iowa City, for appellee.

Heard by Danilson, C.J., and Potterfield and Bower, JJ.

**DANILSON, Chief Judge.**

Tamara and John Stellmach seek a new trial in this medical malpractice action, contending the district court erred in it rulings concerning the admissibility of certain testimony by Dr. Bruce Gantz and Dr. Paul Towner.

Because the jury did not reach the issue of causation, the failure to admit or exclude evidence as to causation is without prejudice to the Stellmachs. The trial court did not abuse its discretion in denying their motion for new trial.

**I. Background Facts and Proceedings.**

On February 22, 2008, Tamara underwent procedures for a voluntary research project at the University of Iowa Hospitals and Clinics (UIHC) Center for Digestive Diseases. The project included a biofeedback study employing transcranial magnetic stimulation (TMS). The consent form for the study described TMS as follows: "Magnetic stimulation uses very short single pulses of magnetic energy to stimulate areas of the brain through the scalp." With respect to the potential risks, the consent form states:

> The most significant, although very rare, risk when using transcranial magnetic stimulation is the induction of seizures. People who have had seizures, major head trauma or a history of epilepsy with no known cause, presence of metal in the skull or under the skull, presence of metal in the back or hips, a cardiac pacemaker, an implanted defibrillator or a medication pump cannot take part in this study. If any of these conditions applies to you, it is VERY IMPORTANT that you share this with the research team and you should not take part in this study.

The next day, February 23, Tamara presented to the UIHC emergency room (ER), reporting "left facial droop and numbness." Tamara reported "the left side [of her face] does feel differently than right, less sensation." The following are included in the ER notes of Dr. Tara Cook:

IMPRESSION

A 40-year old lady with a family history of Bell's Palsy who recently has had a bacterial ear infection, who presents with left facial weakness including both upper and lower weakness, likely representing a post-infectious Bell's Palsy. Given her lack of other focal findings, unlikely representing stroke or hypertensive emergency in the setting of her elevated blood pressure this morning. - TC/kms

PLAN

Recommend follow up with her primary care physician. No need to treat with steroids at this time, given the lack of supporting evidence in the literature.

Dr. Thomas Wernimont noted an impression of "left face weakness, probable Bell's Palsy," indicated the neurology department was contacted for a consult, and concluded "Patient's diagnosis of Bell's Palsy[1] agree with by neurology." Tamara was prescribed anti-viral medication and discharged.

Tamara's facial condition did not improve. On March 5, Tamara presented herself to Dr. Bruce Gantz, a neuro-otologist and the head of the UIHC Department of Otolaryngology—Head and Neck Surgery. Dr. Gantz performed facial nerve decompression surgery that day. Tamara's medical summary after surgery performed by Dr. Gantz indicates Tamara presented with "active problems," including hypertension and "Bell[']s Pals[]y due to transcranial magnet treatment," and that Tamara's "left cranial nerve #4 entrapment was freed up."

On December 3, 2010, the Stellmachs filed suit against UIHC contending it had failed to obtain a proper informed consent before performing the TMS procedure on Tamara and it negligently performed TMS and failed to properly diagnose and treat conditions proximately resulting from TMS.

---

[1] An idiopathic form (i.e., of unknown origin) of facial paralysis resulting from dysfunction of a cranial nerve causing an inability to control facial muscles on the affected side.

Dr. Gantz was deposed in 2011, at which time he opined:

> Q. Do you have any opinion as to whether the [TMS] Ms. Stellmach received—whether that had any possible part in the facial paralysis? A. It could have, and I'll explain why my thought process is there.
>
> Q. Sure. A. When she—When I saw her, and she told me about the transcranial stimulation, she told me it caused a severe pounding in her head, and it caused her head to move. And I was wondering—I don't know for certain—if that had anything to do with reactivation of a herpes simplex virus just like happens in trauma or that we see with lifting up the brain at times.
>
> I have no way of knowing whether that is possible or it—I don't know the levels. I just know that she told me that there was a severe pounding, and it was really impressed upon her that it was extremely uncomfortable, what she had done.
>
> Q. Do you have any opinion as to whether it would be—you would be comfortable with Ms. Stellmach receiving further transcranial magnetic stimulation? A. That's up to her. I mean, I have no opinion. You know, I mean, we don't know if that caused it. It may have contributed to it. I don't know.

UIHC later moved for summary judgment, asserting that, on February 23, 2008, Tamara was seen at the UIHC emergency department for a left-sided facial paralysis and was examined by ER physician Dr. Dana Collaguazo and neurologist Dr. Tara Cook. Tamara was diagnosed with post-infectious Bell's Palsy and was treated with the anti-viral drug Acyclovir, given an eye patch and rewetting drops to protect her left eye, and was instructed to follow up with her primary physician. UIHC alleged there was no evidence it had violated a medical standard of care by only prescribing an anti-viral drug to treat Tamara's facial paralysis, and Dr. Gantz did not provide testimony that UIHC violated the standard of care by failing to properly treat Tamara's facial paralysis, but rather Dr. Gantz testified that he, as a neurologist, would have treated Tamara with an anti-viral drug and a steroid. Dr. Gantz did not testify that treatment with both an

anti-viral drug and steroid was the accepted general medical practice for treating this type of facial paralysis.

In resistance, the Stellmachs asserted the TMS procedure caused a pounding and pain in Tamara's head. Tamara informed the provider of the pounding and pain, yet the procedure was not stopped. The Stellmachs argued:

> Tamara Stellmach was not told of the risks she was facing by undergoing [TMS]. She testified that, had she been told, she would not have undergone the procedure, which was part of a study, not vital to her wellbeing. As a result of undergoing TMS, Tamara Stellmach suffers from permanent facial paralysis, a significant injury. . . . Tamara Stellmach testified that Dr. Gantz told her TMS caused her facial paralysis. Dr. Gantz is an employee and agent of Defendant, and therefore the statement is an admission of a party opponent. Furthermore, Dr. Gantz testified that TMS could have caused the facial paralysis, and explained how the trauma Ms. Stellmach endured during TMS caused inflammation of the facial nerve. Tamara Stellmach testified she had no facial paralysis prior to undergoing TMS. The probability of causation can be shown by joining expert testimony that causation is possible with non-expert testimony that the condition did not exist prior to the event.

The court concluded there were genuine issues of fact precluding summary judgment.

The Stellmachs' amended designation of expert witnesses named Dr. Gantz, who was to "testify in conformity with his deposition regarding issues of informed consent, standard of care, causation, and damages"; "any of her treating health care providers who may or will testify regarding issues of informed consent, standard of care, causation and damages including, but not limited to, staff at [UIHC]"; "admissions made by [UIHC]'s agents and employees"; and reserved the right "to utilize as expert witnesses those individuals designated by Defendant in its Certification to the Court."

At trial, over UIHC's objections, the Stellmachs were allowed to present testimony about Dr. Gantz's statements to them. Tamara testified she saw Dr. Gantz on March 5 and he believed she had a compressed facial nerve and recommended immediate surgery. She asked him if the TMS study could have caused the condition, and "[h]e responded with it's possible that it could have unless I had a head trauma." Tamara also testified that, when she went to a postoperative appointment, Dr. Gantz "felt that the research study from the banging on the head is what caused the nerve to be trapped in my skull."

Tamara's mother-in-law was allowed to testify that, after Tamara's operation, she heard Dr. Gantz say "the research study caused the problem." Tamara's father-in-law also testified:

> Since we were standing right beside John, we did overhear what Doctor Gantz said, and one of the first things that he told John was and he seemed to be—he seemed to be rather upset, was that this—some study she had volunteered to do had damaged her by causing a muscle in her face to jump over a nerve that ran along the side of her face and caused a paralysis.

John testified that he had the following conversation with Dr. Gantz immediately after the surgery:

> I was like do you have any idea what caused this, could that transcranial magnetic stimulation have something to do with it, you know, what—I didn't understand exactly, you know, what the—how it worked with the nerve and stuff like that, and he was very upset and he said that he thought that the research study because he knew what it was, he knew what the TMS was and everything, and he said that, you know, that impact of the coil, it's not an impact like you're hitting somebody on the head but it's a magnetic pulse, there is an impact to it, I think I remember him saying, you know, they use it for bipolar and depression and such. It's kind of a unique tool, it can—if you put it on different places, you make different things happen. If you put it in one specific area, they can make somebody's arm move.

Q. Did Doctor Gantz in that conversation, I think you mentioned that you had asked him if the TMS had anything to do with her condition, did he respond to that? A. Yes, he said yes, he thought it did.

In addition, Dr. Gantz's deposition testimony was allowed to be read into the record over UIHC's objection.

Dr. Gantz was then called as a witness by UIHC and testified:

Well, when Mrs. Stellmach came to see me, she had a facial paralysis on the left side. She couldn't move. I asked her a number of questions about what had gone on because this is the first time I had seen her, and she had told me that she had woke[n] up after having the morning after a transcranial magnetic stimulation procedure and her face was completely paralyzed on that side.

And when we talked about that I asked her about the transcranial magnetic stimulation and she told me that she had a very strong reaction to it, and I may have misinterpreted what she said. She said it was a very violent reaction. I think she had pounding in her head, movement of her head, and sort of a shaking of her head with that stimulation, and she came to me with a diagnosis of Bell's Palsy and it was my initial interpretation that this was probably a Bell's Palsy; but that was the—she emphasized how strong this electro—or transcranial magnetic stimulation was on her, so that was my first discussion with her about this.

Q. And at the time that you had this conversation with Miss Stellmach, were you familiar with the way in which TMS was used in Dr. Rao's study? A. No.

Q. At the time you [had] this conversation with Miss Stellmach were you aware she had an ear infection and reported a metallic taste in her mouth on February 14th, 2008? A. No. That was not in the records that we had at the time.

Q. Did you tell Tamara Stellmach anything about transcranial magnetic stimulation, her report of head shaking, Bell's Palsy? A. Well, what I said was you know, if this was a violent head shaking, we had seen on occasion people that have had head trauma like in a car accident or concussive injury that came in a few days after that with a facial paresis or paralysis and I was wondering at the time and when this occurs we sometimes think it's a stimulus to reactivate virus in the nerve which a lot of people think is the cause of Bell's Palsy, that you can reactivate a nerve from an infection like ear infection or fever. . . . And so I didn't know at the time that she had had an ear infection and described a metallic taste in her mouth and ear pain, and that metallic taste in the mouth is usually

prodome to a facial nerve involvement of some sort, and so that comes sometimes with Bell's Palsy, because the chorda tympani nerve, the nerve that travels with the facial nerve gives taste to the anterior two-thirds of the tongue and so if you have some involvement of the facial nerve of any type of possibly some swelling or whatever of that facial nerve then you can get this metallic taste, so I wasn't aware of that at the time when I first saw her.

At one juncture in UIHC's direct examination of Dr. Ganz, a question was asked if he had a changed opinion, to which he responded,

Well, I have since found out that the transcranial magnetic stimulation really doesn't have the capacity or intensity to cause a head shake. This device has about a one Tesla magnetic pull to it. That's the way we measure magnetic force, and so when you put a device like that on the scalp, it has an intense 1.5 or so magnetic pull at the skin but as you go deeper into the skull and into the brain, the power of that or the intensity of that magnetic pull decreases at a factor of four for every millimeter or two you go in it decreases in intensity. It's really not possible that transcranial magnetic stimulation could induce such a strong stimuli to stimulate the motor cortex of the brain which is what I thought possibly was going on at the time, but I didn't know much about transcranial magnetic stimulation because I didn't use it. I read about it because in the past some people tried to use it as a mechanism to diagnose the facial nerve injury and how severe it was, because we can't get to the area that's involved because it's in the ear bone way in deep, so we try to measure the traffic through where that injured area to see how much injury there was, but transmagnetic cranial stimulation [sic] never panned out. People tried to get a retrograde stimulus, measure the response in the brain, it never worked out. People that used that to stimulate the facial nerve and I also did a literature search and I didn't find any evidence that transmagnetic cranial stimulation [sic] can induce a Bell's Palsy or facial paralysis—let's not say Bell's Palsy but a facial paralysis.

Ultimately, Dr. Ganz testified that he thought Stellmach had Bell's Palsy and "it was just circumstantial that she developed the paralysis following the procedure."

One of the highly disputed issues then arose during cross-examination when plaintiffs' counsel explored when Dr. Gantz had learned of Tamara's ear infection. Dr. Gantz replied,

> When I looked at the records about a month or so ago. . . .
>
> Q. Have you ever had any conversations or discussions other than scheduling with any of the attorneys for the defense?
>
> MR. YAMADA [DEFENSE COUNSEL]: Objection, calls for privileged information.
>
> MR. WESTON [PLAINTIFF'S COUNSEL]: I'm asking about the existence of the conversations, not the content at this point.
>
> THE COURT: Then the witness may answer the question.
>
> A. I've had conversations with Mr. Yamada about this case.
>
> Q. About the substance of the case?
>
> MR. YAMADA: Same objection, calls for privileged information.
>
> THE COURT: Sustained.

A lengthy discussion was then held outside the presence of the jury. After hearing extensive arguments of counsel, the court persisted in sustaining the objection.

After the conclusion of all live witnesses, plaintiffs' counsel asked to make a further argument in respect to Dr. Gantz's testimony. The plaintiffs argued Dr. Gantz's testimony concerning his changed opinion should be stricken as a sanction for UIHC's failure to provide notice under Iowa Code section 622.10 (2009). UIHC argued section 622.10 was not applicable, noting Dr. Gantz was a client and the court had allowed the Stellmachs to testify about conversations with Dr. Gantz as non-hearsay because they argued he was a party-opponent. The court ruled "there is an attorney/client privilege and I sustained the objection [to the substance of discussions between Dr. Gantz and defense counsel], and I don't have any basis to sanction [defense counsel], I don't think under 622.10, subsection three, subsection 'e'."

UIHC also objected to any testimony by Tamara's personal physician, Dr. Paul Towner, about whether TMS caused her facial paralysis. The trial court ruled:

So after giving consideration to your arguments yesterday, it's the court's ruling that with regard to Doctor Towner's deposition, the defendant's objections are all overruled except the court sustains the objection with regard to the testimony on page 100, beginning at line 2, and all the way to page 103, at line 11, and I guess I will just address that ruling now.

What that does is that prohibits Doctor Towner from testifying about the TMS procedures causing the facial paralysis, and the court gave consideration to this and, you know, first of all, I acknowledge that the testimony is relevant under [rule of evidence 5.]403 but I think that there is a potential that it would cause confusion for the jury because it invites the jury to give weight to this testimony from an expert.

Doctor Towner is an expert. He is a treating physician but he would be seen as an expert. By his own admissions the court finds that Doctor Towner lacks the scientific technical other knowledge for an expert to testify under [rule 5.]702.[2] I guess specifically he indicates that in his testimony on page 101 that he has never seen transcranial magnetic stimulation. In addition, on page 102 he indicates that he doesn't know anything about the level of magnetic force that was involved in the procedure, and also on that page he states I don't even know what units are used to measure it and then on page 102 and 103, especially 103 he uses the word imagine and in that he would imagine certain things, and the court finds that it's just—it would go too far to let the court allow a medical doctor with Doctor Towner's scientific technical specialized knowledge testify about the TMS and I think he basically—being a cause of the facial paralysis. He basically admits himself.

The district court granted a directed verdict for UIHC on the claim of

negligent failure to obtain informed consent, stating:

So the reason that I don't think we have a jury issue on that is that the plaintiffs simply did not provide anything close to substantial evidence that the performance of TMS would cause Bell's Palsy. In fact, I've heard overwhelming evidence to the contrary; and so the court doesn't find that that was something that the defendant needed to warn the plaintiff of in an informed consent document before performing TMS.

I also find that the plaintiffs did not produce sufficient evidence to let this informed consent issue go to the jury because

---

2 Dr. Towner was asked, "Do you know anything about transcranial magnetic stimulation?" His response was "No."

TMS—she should have been warned that it would cause pain or that it could cause trauma to the 7th cranial nerve.

The trial court, however, denied directed verdicts on two questions: whether there was negligence in the TMS performed upon Tamara on February 22, 2008, and in regard to the claim that UIHC committed negligence on February 23 when Tamara received medical care and treatment at the UIHC ER.

The jury found no fault attributable to UIHC. The Stellmachs now appeal, claiming the court erred in not sanctioning UIHC by striking Dr. Gantz's changed opinion testimony and abused its discretion in excluding Dr. Towner's opinion testimony.

## II. Scope and Standards of Review.

To the extent that we are required to interpret Iowa Code section 622.10, our review is for correction of errors at law. *See State v. Olutunde*, 878 N.W.2d 264, 266 (Iowa 2016) (noting we review rulings of statutory interpretation for correction of errors at law). On the question of whether the district court properly exercised its discretion in excluding testimony of Drs. Gantz and Towner, our review is for abuse of discretion. *See Hansen v. Cent. Iowa Hosp. Corp.*, 686 N.W.2d 476, 479-80 (Iowa 2004).

## III. Discussion.

*A. Causation Testimony by Dr. Towner.* We first address the trial court's decision to exclude deposition testimony by Dr. Towner, during which he opined that, based on the timing of the TMS and Tamara's Bell's Palsy, "I do believe that the forces involved in the magnetic treatment could cause swelling in the nerve."

The rules of evidence allow testimony by "a witness qualified as an expert by knowledge, skill, experience, training or education" if the expert's "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Iowa R. Evid. 5.702. As noted by the Stellmachs, Iowa courts are "committed to liberal rule [that] allows opinion testimony if it is of a nature which will aid the jury and is based on special training, experience, or knowledge [as] to the issue in question." *Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 774 (Iowa 2006) (alterations in the original) (citation omitted).

Here, Dr. Towner testified he had "never seen" TMS, did not know what area of Tamara's head the magnetic coil was near, did not know anything about the level of the magnetic force, and, in fact, did "not even know how they even measure magnetic force and what units they would use." The trial court did not abuse its discretion in determining Dr. Towner's opinion testimony that TMS could cause nerve swelling should not be allowed because Dr. Towner had no expertise of relevance. *See id.* ("The facts must be sufficient to allow the expert to reach a conclusion that is 'more than mere conjecture or speculation.'" (citation omitted)).

*B. Testimony by Dr. Gantz.* At trial, the Stellmachs introduced Dr. Gantz's deposition testimony and were allowed to offer several witnesses who testified as to statements they heard made by Dr. Gantz. The defense then called Dr. Gantz. In his direct testimony for the defense, Dr. Gantz testified he no longer

believed Bell's Palsy could have been caused by TMS. The trial court denied the Stellmachs' motion to strike Dr. Gantz's changed opinion testimony.[3]

On appeal, the Stellmachs argue the trial court erred in refusing to instruct the jury to disregard Dr. Gantz's changed opinion testimony as a sanction for the defense's failure to notify the plaintiffs pursuant to Iowa Code section 622.10(3)(e). They also assert UIHC should have been sanctioned for failure to supplement discovery pursuant to Iowa Rule of Civil Procedure 1.508(3).

*1. Section 622.10.* During cross-examination, and relying on *Keefe v. Bernard*, 774 N.W.2d 663 (Iowa 2009), plaintiffs' counsel sought to strike Dr. Gantz's live testimony as a sanction for the defense's failure to comply with Iowa Code section 622.10, which they argued "requires that if the defense meets with a treating physician, they're required to provide notice to the plaintiff's to allow them to be present for the meeting as well."

Section 622.10 deals with the doctor-patient privilege and prohibits a physician from disclosing any confidential communication unless "the person in whose favor the prohibition is made waives the rights conferred." Iowa Code § 622.10(1), (2). However, the "prohibition does not apply to physicians or surgeons . . . in a civil action in which the condition of the person in whose favor the prohibition is made is an element or factor of the claim or defense of the

---

[3] Plaintiff's counsel characterized Dr. Gantz's change of opinion as follows:

> MR. WESTON: Briefly, Your Honor, with regard to the question in Doctor Gantz's change in opinion, page 35, line 16 in his deposition, he was asked: Do you have any opinion as to whether the TMS Mrs. Stellmach received, whether that had any possible part in the facial paralysis? Answer: It could and I'll explain why my thought process is there. And went on to explain that.
>
> Today his testimony was completely different, that he believed that TMS could not have caused [Ms.] Stellmach's facial paralysis. So there is a substantial significant change in Doctor Gantz's testimony . . . .

14

person." *Id.* § 622.10(2). Under paragraph "3," which deals with a "civil action in which the condition of the plaintiff in whose favor the prohibition is made is an element or factor of the claim or defense of the adverse party," the defendant's counsel is required to "provide written notice to plaintiff's attorney in a manner consistent with the Iowa rules of civil procedure providing for notice of deposition at least ten days prior to any meeting with plaintiff's physician or surgeon." *Id.* § 622.10(3)(e). Moreover, a plaintiff's attorney "has the right to be present at all such meetings." *Id.*

This is the section upon which the Stellmachs sought to sanction the defendant, claiming the meeting between Dr. Gantz and the UIHC attorney violated the provision because no notice was sent to them. The difficulty here is that Dr. Gantz is an employee of UIHC, although that does not necessitate the conclusion that all of his communications with the UIHC attorney were privileged.

In *Keefe*, our supreme court discussed the tensions between the attorney-client privilege, attorney work product, and the notice provision of section 622.10. 774 N.W.2d at 667-75. As relevant here, we quote:

> We agree with the United States Supreme Court that the corporate attorney-client privilege should not be limited to those in the "control group." Instead, the test must focus on the substance and purpose of the communication. If an employee of a corporation or entity *discusses his or her own actions relating to potential liability of the corporation, such communications are protected by the attorney-client privilege. See Samaritan Found.* [*v. Goodfarb*], 862 P.2d [870,] 876 [(Ariz. 1993)] ("It is universally accepted that communications directly initiated by an employee to corporate counsel seeking legal advice on behalf of the corporation are privileged."). *If, on the other hand, a corporate employee is interviewed as a "witness" to the actions of others, the communication should not be protected by the corporation's attorney-client privilege.*

> Here, to the extent Dr. Sneller discussed his own actions and McFarland Clinic's potential liability for his actions with McFarland Clinic's attorney, Rouwenhorst, such communications are protected by McFarland Clinic's attorney-client privilege. However, to the extent Dr. Sneller discussed his observations as a witness to or expert on the effects of Dr. Bernard's treatment of the patient, his communications are not protected by McFarland Clinic's attorney-client privilege.

*Id.* at 672 (emphasis added) (footnote omitted). In *Keefe*, the supreme court determined a memorandum prepared by the defense attorney concerning a meeting with Dr. Sneller was not protected by the attorney-client privilege and, thus, "not shielded from the notice provision" of section 622.10(3)(e). *Id.* at 672-73. However, the court did find that certain statements in the memorandum *were* protected by the work-product doctrine and were shielded from the notice requirement. *Id.* at 675-76.

The problem presented to us, however, is that we have no record of what was discussed between Dr. Gantz and defense counsel. We do not know if Dr. Gantz discussed his own actions or his observations as a witness to or expert on the effects of the TMS. Here there was apparently no *in camera* record made, and plaintiffs made no offer of proof. We acknowledge that the burden of proof to establish the attorney-client privilege applies is upon UIHC. *See State v. Tensley*, 249 N.W.2d 659, 661 (Iowa 1977). However, "[t]he general rule is that failure to offer proof of excluded testimony leaves nothing for review." *In re Estate of Herm*, 284 N.W.2d 191, 197 (Iowa 1979). The only exception to the rule is if "the whole record makes apparent what is sought to be proven." *Id.* Under these facts we are unable to conclude the exception applies, and we are unable to determine whether section 622.10 shielded the communication from

the notice provision.  Accordingly, we are unable to say the district court abused its discretion in sustaining the objection.

*2. Rule 1.508.*  The Stellmachs also argue the trial court erred in failing to find the defendant failed to disclose or supplement Dr. Gantz's opinion testimony.  The Stellmachs served interrogatories requiring disclosure of the substance of the testimony of witnesses intended to be called by UIHC.  They note that, in UIHC's response to their interrogatories about trial witnesses, UIHC "did not provide any information regarding Dr. Gantz."  They contend the defense had a duty to disclose Dr. Gantz's "new opinions at least thirty days prior to trial" under rule 1.508(3).

Dr. Gantz was a treating physician and was identified as the Stellmachs' expert but he was also identified as a witness for UIHC in response to interrogatories served by the Stellmachs.  He would have fallen within the designation of "any and all witnesses identified at any time by Plaintiffs," and he was named as a possible rebuttal witness.

We are guided in part by rule 1.508, which provides in pertinent part:

> (1) Expert who is expected to be called as a witness. In addition to the disclosures and discovery provided pursuant to rules 1.500(2) and 1.516, discovery of facts known, mental impressions, and opinions *held by an expert whom the other party expects to call as a witness at trial, otherwise discoverable under the provisions of rule 1.503(1) and acquired or developed in anticipation of litigation or for trial*, may be obtained as follows:
> a. Deposition of an expert who may testify. A party may depose any person who has been identified as an expert whose opinions may be presented at trial.  If rule 1.500(2)(b) requires a report from the expert, the deposition may be conducted only after the report is provided.
> . . . .
> (3) Duty to supplement discovery as to experts. *For an expert whose report must be disclosed* under rule 1.500(2)(b), the

party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed no later than 30 days before trial. Failure to disclose or supplement the identity of an expert witness or the information described in rule 1.500(2) is subject to sanctions under rule 1.517(3)(a).

(Emphasis added.)

Rule 1.508(3) imposes the duty to supplement upon the party who has designated an expert "*whose report must be disclosed* under rule 1.500(2)(b)." (Emphasis added.) Rule 1.500(2)(b) applies to a witness who is "retained or specially employed to provide expert testimony in the case or whose duties as the party's employee regularly involve giving expert testimony." *See Whitley v. C.R. Pharmacy Serv., Inc.*, 816 N.W.2d 378, 386 (Iowa 2012) (concluding our discovery rules exist to avoid surprise and that the duty to supplement responses is intended "to clarify issues prior to trial, avoid surprise to parties, and allow a complete opportunity to prepare for trial").

UIHC argued the rule did not apply to it and Dr. Gantz. After lengthy discussion, outside the presence of the jury, the trial court ruled:

> THE COURT: All right. I'm going to deny your motion to strike the testimony of Doctor Gantz and your request to instruct the jury to disregard his testimony this morning, and I recall when you sought to have his statements in a deposition about TMS introduced, the defense objected to that and the court granted your request to have that testimony come in, so it did come in; but the defense asked at that point but the question would we be able to call Doctor Gantz to testify here in person and the court said yes, would be able to do that.
> I think certainly implied in the court's ruling if I was going to let in this testimony, that certainly when Doctor Gantz came in, the State was going to be able to ask him questions that were relevant to the case, and to the opinions that are shown in the deposition.
> I don't think this is the kind of case where that it would be fair to say the plaintiffs would be surprised. All of the information that I have heard about that Doctor Gantz based his testimony on today

was available to the plaintiffs had you wanted to check to make sure that his gut reaction if when he was forming some opinions based solely on what looked like the statements he had heard from Mrs. Stellmach, if you had wanted to check and see if since that time he had learned anything more, you would have been able to do that, and so I can't find, you know, without—I can't find that you would be unduly prejudiced because I can't—I don't—I think that the plaintiffs wanted Doctor Gantz's testimony to remain fixed and it's, I think, you might have had—I think you had some good reasons to believe it might not have remained fixed if it was based solely on what Mrs. Stellmach told Doctor Gantz.

UIHC also argues it was exempt from the supplementation requirement of rule 1.508(3) because Dr. Gantz was not an expert retained in anticipation of litigation. However, when a treating physician "assumes a role in litigation analogous to the role of a retained expert," supplemental discovery may become obligatory. *Day v. McIlrath*, 469 N.W.2d 676, 677 (Iowa 1991); *see also Carson v. Webb*, 486 N.W.2d 278, 280-81 (Iowa 1992). Here, UIHC used Dr. Gantz and his newly-formed opinions on causation in a manner analogous to a retained expert—without identifying him as its expert and without supplementing its responses to interrogatories. We do not agree with UIHC that it is excused from an obligation to supplement its responses to interrogatories because Dr. Gantz was the Stellmachs' named expert under these circumstances. Dr. Gantz formed his new opinion well after he was no longer treating Tamara Stellmach. It is also not disputed that UIHC counsel were aware of Dr. Gantz's changed opinion on the material issue of causation prior to trial. The fact that the Stellmachs could have re-deposed Dr. Gantz prior to trial or contacted him to see if he had a changed opinion is not of consequence in determining if UIHC complied with its duties to supplement discovery responses. *See Hoekstra v. Farm Bureau Mut.*

*Ins. Co.*, 382 N.W.2d 100, 109 (Iowa 1986) (finding lack of pretrial preparation does not excuse the opposing party's duty to supplement discovery).

Although we believe the trial court was within its authority to impose sanctions during the trial, we find the remedy of the exclusion of Dr. Gantz's testimony of his newly-determined opinion on causation is no longer material or timely to the relief sought on appeal. The Stellmachs seek a new trial. We premise our conclusion on the fact the jury did not reach the issue of causation—finding no fault—and, thus, the failure to impose a sanction excluding Dr. Gantz's testimony on causation was not prejudicial. The Stellmachs received a trial on the merits on the issue of fault and cannot complain about the failure to exclude evidence having no relevance to that issue. We affirm.

## IV. Conclusion.

Because the jury did not reach the issue of causation, the failure to admit or exclude evidence as to causation is without prejudice to the Stellmachs. The trial court did not abuse its discretion in denying their motion for new trial.

**AFFIRMED.**