**MECHDYNE CORPORATION, an Iowa Corporation, Plaintiff,**

v.

**Donald J. GARWOOD, Defendant.**

**Donald J. Garwood, Counterclaim Plaintiff,**

v.

**Mechdyne Corporation, an Iowa Corporation, Counterclaim Defendant.**

**Donald J. Garwood, Third–Party Plaintiff,**

v.

**Chris Clover, Third–Party Defendant.**

No. 4:08–CV–00451–JEG.

United States District Court, S.D. Iowa, Central Division.

Oct. 21, 2009.

---

Matthew C. McDermott, David M. Swinton, Belin McCormick, P.C., Des Moines, IA, for Plaintiff.

Stephen E. Doohen, Whitfield & Eddy, PLC, Des Moines, IA, for Defendant.

## ORDER

JAMES E. GRITZNER, District Judge.

This matter comes before the Court on a Motion for Summary Judgment by Counterclaim Defendant Mechdyne Corporation (Mechdyne) and Third–Party Defendant Chris Clover (Clover) (collectively, Mechdyne), which Plaintiff Donald J. Garwood (Garwood) resists. The Court conducted a hearing on the motion on August 13, 2009. Attorney Steve Doohen represented Garwood; attorney Kerrie Murphy represented Clover; and attorney David Swinton represented Mechdyne. The matter is fully submitted and ready for disposition.

## I. FACTUAL BACKGROUND

The following facts are either not in dispute or viewed in the light most favorable to Garwood, the nonmoving party.

Mechdyne is located in Marshalltown, Iowa, and designs and integrates turnkey advanced audio visual, immersive 3D, networked and collaborative visualization solutions. Mechdyne's customers include government laboratories, universities, military and aerospace companies, energy companies, and others. Clover established Mechdyne in 1996 and is Mechdyne's CEO.

Mechdyne hired Garwood on September 1, 1999. On July 18, 2000, Garwood executed an "Employee/Contractor Non–Disclosure/Non–Disclosure/Non–compete Agreement" (the NCA). In relevant part, the NCA prohibited employees from competing against Mechdyne during their employment and for a period of three years following termination of their employment. Mechdyne considered Garwood one of its top salesmen and described Garwood as a "superstar."

In July 2008, without Mechdyne's knowledge, Garwood applied for a position with The Whitlock Group (Whitlock), an occasional competitor of Mechdyne.[1] On August 19, 2008, after several interviews and

---

**1.** Although Garwood disputes the extent to which Whitlock competed with Mechdyne, Whitlock COO Roger Patrick (Patrick) testified at his March 27, 2009, deposition that in 2008, Whitlock was in competition with Mechdyne for a million dollar British Petroleum project in Houston, Texas. Patrick also testified that "over the past five years or so" Whitlock was in competition with Mechdyne over various projects for The Boeing Compa-

meetings, Whitlock extended Garwood an offer of employment as an at-will employee, indicating Garwood's employment would be subject to termination with or without cause or notice at Whitlock's discretion.

On September 3, 2008, Garwood met with Clover and John Bethel (Bethel), Mechdyne's Vice President of Sales, and informed them that he was considering employment with Whitlock. Garwood, Clover, and Bethel discussed options to keep Garwood at Mechdyne; Clover and Bethel also advised Garwood that accepting employment with Whitlock would be a breach of Garwood's NCA.

On September 8, 2008, Ryan Torrey (Torrey), who had resigned his position with Mechdyne on August 29, 2008,[2] sent an email to Clover and Bethel, with the subject line, "Hearing rumors." Therein Torrey informed Clover and Bethel that Garwood sent Torrey a link to Whitlock's job postings and told Torrey to "look into to it."[3]

On September 10, 2008, Garwood submitted a resignation letter to Mechdyne indicating he accepted a position as an account executive with Whitlock. Also on September 10, Clover sent Garwood a letter informing Garwood that (1) he was in violation of his NCA; (2) Mechdyne intended to take all action, legal or otherwise, to enforce the terms of the NCA; and (3) Garwood needed to immediately return all Mechdyne property and confidential information stored on either his home computer or by other electronic means.

The same day, Clover also sent a letter to Whitlock with a copy of Garwood's NCA

attached advising Whitlock that Garwood had executed the NCA and that Mechdyne intended to enforce the terms of the NCA.

Garwood began his employment at Whitlock on September 11, 2008, and signed documents acknowledging his at-will employment status.

In a letter dated September 11, 2008, Whitlock COO Roger Patrick (Patrick) responded to Clover's letter of September 10, 2008. Therein, Patrick acknowledged Mechdyne's position regarding the violation of Garwood's NCA and opined that Garwood's NCA was "overly broad and unenforceable as written." Mechdyne's App. 44. Patrick nonetheless assured Mechdyne that Whitlock would not place Garwood "in a position where he would directly compete for or solicit Mechdyne's customers with whom he previously worked, or disclose any confidential or proprietary information." Mechdyne's App. 44. Patrick also postulated that "while The Whitlock Group and Mechdyne may occasionally vie for the same contracts, [Garwood's] primary future role at The Whitlock Group will not be competitive to your organization's core competence, focus or even geographic footprint" and furthermore, Whitlock's business needs "may eventually cause [Garwood] to move outside his current geography...." Mechdyne's App. 45.

On September 12, 2008, Clover responded to Patrick's September 11 letter disputing Patrick's contention that Whitlock and Mechdyne were not competitors. Clover also informed Patrick that there were numerous reasons why Garwood's employment at Whitlock violated the

---

ny in St. Louis, Missouri, and at least one project for Sandia Labs. Mechdyne's App. 138.

**2.** Torrey returned to work for Mechdyne on March 1, 2009.

**3.** Garwood does not dispute that Torrey sent this email to Clover and Bethel but argues that it was Torrey who first suggested to Garwood to contact Whitlock.

NCA. Clover's September 12 letter stated in relevant part as follows:

Your statements concerning what Mr. Garwood's "primary" future role will be, or what his "primary" focus will be, or that he will not "directly" compete with Mechdyne, or that he will not involve "past customers of Mechdyne", or that Mr. Garwood will not advise employees that work in Mechdyne's "core product line" do not provide any comfort to us. These adjectives of limitation only serve to indicate that to the extent possible, Mr. Garwood intends to do what he can to circumvent the spirit and intent of the NCA. In fact, his intent to violate the spirit of your letter has been made clear ("5. Prohibit Don from soliciting any employees of Mechdyne during the term of the Agreement"), as Mechdyne has direct knowledge that Mr. Garwood has already attempted to solicit Mechdyne employees to leave our company to go to work at Whitlock. All of these factors give us little confidence that he intends to abide by the terms of the NCA, or that you will be able to successfully keep him from violating the terms of the NCA.

Finally, Mr. Garwood was hired by Mechdyne with absolutely no knowledge, skill, know-how, or information related to "audiovisual, broadcast and control room environments." Everything he knows about this market, he learned while employed at Mechdyne. Therefore, he could not possibly carry out the role you envision for him at Whitlock without disclosing Mechdyne trade secrets, confidential information, knowledge, know-how, marketing plans and strategies, pricing strategies, or other subject matter pertaining to Mechdyne's business.

Garwood's App. 47.

Garwood sent a letter to Mechdyne on September 15, 2008, informing Mechdyne that he had enclosed all Mechdyne equipment, files, and data, and had destroyed all soft copy documents from his home computer.

Shawn Wade (Wade), a project manager for Mechdyne since 1998, had a meeting with a Mechdyne client on September 18. During the meeting the client asked Wade for Garwood's new contact information, explaining that Garwood had provided him with his new cell phone number and that Garwood had contacted another Mechdyne client. Wade informed his supervisor about these events.

By September 24, Whitlock had not responded to Clover's September 12 letter, so Clover sent another letter informing Whitlock that Mechdyne knew Garwood had been contacting Mechdyne customers as he left or after he resigned his position at Mechdyne. Clover advised Whitlock that if it did not terminate Garwood's employment within twenty-four hours, Mechdyne would have no choice but to "take legal action to enforce the NCA." Mechdyne's App. 51.

On October 21, 2008, Patrick responded to Clover's September 24 letter advising Mechdyne that Whitlock was fully prepared to defend its legal right to employ Garwood. Patrick also informed Clover that Garwood had informed Whitlock that he had returned all Mechdyne's property and would not disclose any of Mechdyne's confidential or proprietary information.

Mechdyne retained computer forensic expert Aaron Hughes (Hughes) to examine and analyze the laptop Garwood returned to Mechdyne. Hughes prepared and submitted a report to Mechdyne on November 3, 2008, advising Mechdyne that his investigation revealed that on August 21, 2008, Garwood had created a folder on his laptop titled "Whitlock," which contained files with the following names: Mechdyne client list (tempoutput.txt); LightSpeed Design

# D Projectors.pdf; Image002.jpg; Don-ald_Garwood.pdf: Job Description–Garwood.pdf; Commission_matrix—Garwood.pdf; default.htm; and BP Proposal doc. Hughes' report also revealed multiple files that had been copied from Garwood's laptop to an external hard drive and that the bulk of the files were transferred between August 22 and September 4, 2008. Garwood disputes the accuracy of the software programs used to retrieve information from the laptop, the users of the software program, the potential damage caused by removing the hard drive, and the chain of custody of the laptop; but he does not deny that these tests were performed or that Hughes included this information in his report. Garwood also qualifies that Mechdyne employee Carl Struebing (Struebing) advised and assisted Garwood in backing up the data from the laptop to the external hard drive because a computer virus had developed on the laptop during the summer of 2008. Garwood did not return the external hard drive to Mechdyne. Garwood clarifies that he purchased the external hard drive himself, and therefore he was not obligated to return it, and furthermore that the external hard drive was lost during his move from Iowa to Austin, Texas.

On November 6, 2008, Mechdyne filed this lawsuit against Garwood alleging, inter alia, Garwood downloaded to his laptop and then to an external hard drive a copy of Mechdyne's confidential information, which included a text file of Mechdyne's customer list. The complaint raised claims for breach of the non-compete provision of the NCA, breach of the confidentiality provision of the NCA, and breach of fiduciary duty. Mechdyne's attorney sent Whitlock a courtesy copy of the complaint.

After receiving the courtesy copy of the complaint, Whitlock asked Garwood about the allegation that Garwood possessed Mechdyne confidential information.

Garwood admitted that he had an external hard drive in his possession that contained Mechdyne confidential information but explained that it had been obtained at Struebing's direction. On November 11, 2008, Whitlock sent Garwood a letter terminating Garwood's employment. The November 11 letter stated, in pertinent part as follows:

> The Whitlock Group regrets to terminate your at-will employment, effective immediately. Your last day of employment will be effective today.
>
> The Whitlock Group previously informed you that it would not tolerate any retention or disclosure of confidential, proprietary information of your former employer. You indicated to The Whitlock Group upon your hiring that you had returned all company property to Mechdyne. Mechdyne has now raised allegations against you that based on a forensic expert's inspection of your Mechdyne computer you downloaded confidential, proprietary information prior to your resignation that was not returned. While this situation is unfortunate as the allegations against you have not yet been proven true, The Whitlock Group is not willing to take any risks that another entity's confidential, proprietary information may be disclosed to its employees, downloaded to its computer system or in any way used in The Whitlock Group's business operations.
>
> . . . .
>
> Don, we will consider you eligible for re-hire, if you are successful in eliminating these legal issues. We wish you the best of luck in your efforts.

Mechdyne's App. 57. At his deposition, when asked, "What would you characterize as the reason you terminated Mr. Garwood?", Patrick testified, "The confirmation that he had a hard drive and that he had at least e-mailed one file or some-

how transferred one file into The Whitlock Group e-mail domain and office." Mechdyne's App. 140.

On November 12, 2008, Clover sent an intra-company memorandum to Mechdyne employees advising them that Mechdyne filed a lawsuit against Garwood to enforce the NCA and "to seek redress for the fact that, according to a forensic computer expert, [Garwood] copied and took with him a large amount of [Mechdyne]-critical data including a complete Mechdyne customer list, customer proposals (including many written by his other fellow account managers), and FY09 sales strategic plans." Mechdyne's App. 58. Clover stated that the situation was "difficult for me to understand, and [to] have to take action on, as Don was a friend to many of you and had been a friend of mine for the last 18 years." *Id.* Clover advised Mechdyne employees not to discuss the pending litigation and asked them to notify management if Garwood were to contact them.

Also at issue in this motion are two letters exchanged after this litigation began between Garwood's attorney, Stephen Doohen (Doohen), and Mechdyne's attorney, David Swinton (Swinton). Doohen sent Swinton a letter on January 12, 2009, informing him that Garwood intended to seek employment with CyViz in Washington D.C. Doohen asked Swinton to inform him whether Mechdyne would consider Garwood's employment with CyViz as a violation of the NCA. Swinton responded to Doohen on January 14, 2009, informing Doohen that Mechdyne did regard Garwood's employment with CyViz a violation of the NCA because CyViz was a competitor of Mechdyne as Garwood acknowledged at his deposition.

Garwood filed counterclaims against Mechdyne and a third-party lawsuit against Clover alleging claims for defamation and intentional interference with contract. Mechdyne and Clover filed this motion, arguing they are entitled to summary judgment on Garwood's defamation and intentional interference with contract claims.[4] Garwood resists.

## II. DISCUSSION[5]

### A. Summary Judgment Standard

"Summary judgment is appropriate if the record shows no genuine issue of material fact, entitling the moving party to a judgment as a matter of law." *Corn Plus Co-op. v. Cont'l Cas. Co.,* 516 F.3d 674, 678 (8th Cir.2008). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party." *Miner v. Local 373,* 513 F.3d 854, 860 (8th Cir.2008) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). On a motion for summary judgment, the court views the evidence and inferences in the light most favorable to the nonmovant. *Id.* The nonmovant "must

---

4. Given the similarity of posture and issues, in the discussion below the Court refers to Mechdyne and Clover collectively as Mechdyne.

5. As a preliminary matter, the Court addresses an objection raised by Plaintiffs at the August 13, 2009, motion hearing. On August 12, 2009, the day before the motion hearing, Garwood filed a pleading captioned, "Supplemental Appendix." Clerk's No. 63. A cover statement filed with the document explained that the supplement contained Hughes' deposition transcript, which was unavailable at the time Garwood filed his appendix. In his response to Mechdyne's statement of undisputed facts, Garwood indicated Hughes' deposition transcript was not available at that time and that page references would be added when the transcript became available. Mechdyne did not file an objection at that time. Having reviewed the document the Court finds it did not add any new argument or evidence and does not prejudice Mechdyne. Mechdyne's objection is overruled.

set forth specific facts sufficient to raise a genuine issue for trial," and "may not rest upon mere denials or allegations in the pleadings." *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

## B. Defamation Claim

Garwood's defamation claim arises from statements in five documents: the letters sent by Mechdyne to Whitlock on September 12, 2008, and September 24, 2008 (the September letters); Clover's intra-company memorandum dated November 12, 2008, that was sent to all Mechdyne employees and salespersons; and the two letters sent between opposing counsel after this litigation commenced. Mechdyne argues it is entitled to summary judgment because the alleged defamatory statements contained in those documents are (1) substantially true, (2) statements of opinion not statements of fact, (3) not communicated to third parties, (4) not defamatory in nature, and (5) subject to qualified privilege. Mechdyne further argues Garwood cannot demonstrate he was damaged as a result of the allegedly defamatory statements. Garwood resists, asserting that the defamation claims must be taken in light of the overreaching allegations Mechdyne made against Garwood.

■ "Defamation involves the publication of written or oral statements which tend to injure a person's reputation and good name." *Kerndt v. Rolling Hills Nat'l Bank,* 558 N.W.2d 410, 418 (Iowa 1997). Defamation involves the twin torts of libel and slander. *Theisen v. Covenant Med. Ctr.,* 636 N.W.2d 74, 83 (Iowa 2001) (citing *Lara v. Thomas,* 512 N.W.2d 777, 785 (1994)). Garwood initially pleaded his defamation claim under the theories of both libel and slander; at the hearing, however, Garwood conceded his claim is based only on written or libelous statements. *See Yates v. Iowa W. Racing Ass'n,* 721 N.W.2d 762, 768 (Iowa 2006) ("Libel is generally a written publication of defamatory matter, and slander is generally an oral publication of such matter.") (quoting *Schlegel v. Ottumwa Courier,* 585 N.W.2d 217, 221 (Iowa 1998)). There are two types of libel: libel per se and libel per quod. *Schlegel,* 585 N.W.2d at 221.

### 1. Libel Per Se/Libel Per Quod

■ Garwood asserts Clover's statement that "contacts may have already been made by [Garwood] under the guise of being sociable, but were intended in part to gather information about our current business activities," is clearly an attack on Garwood's character and therefore constitutes libel per se. Mechdyne disagrees.

■ "An attack on the integrity and moral character of a party is libelous per se." *Vinson v. Linn–Mar Cmty. Sch. Dist.,* 360 N.W.2d 108, 115–16 (Iowa 1984). "If a statement is clear and unambiguous, the issue of whether the statement is libelous per se is for the court. If the court determines a statement is libelous per se as a matter of law, the burden shifts to the defendant to prove the statement was used and understood in a different sense." *Kiesau v. Bantz,* 686 N.W.2d 164, 175 (Iowa 2004) (citations omitted).

In determining whether language is libelous per se, it must be viewed stripped of any pleaded innuendo. The meaning of the phrase 'per se' is 'taken alone, in itself, by itself.' Words which are libelous per se do not need an innuendo, and, conversely, words which need an innuendo are not libelous per se.

*Shaw Cleaners & Dyers v. Des Moines Dress Club,* 215 Iowa 1130, 245 N.W. 231, 233 (1932); *Ragland v. Household Fin. Corp.,* 254 Iowa 976, 119 N.W.2d 788, 790 (1963) (citations omitted) ("The determination of whether a publication is libelous per

se is for the court in the first instance. This determination is made by reference to the statements made, without reference to the defamatory sense in which plaintiff claims such statements were intended and understood."). If a defendant's statement is found to be libelous per se, damage to reputation is presumed. *Schlegel,* 585 N.W.2d at 222.

■ "[S]ome statements are defamatory per se; that is, they are of such a nature that the court can presume as a matter of law that their publication will have a defamatory effect, even without a showing by the plaintiff of malice, falsity, or damage." *Kerndt,* 558 N.W.2d at 418. Statements qualifying as libel per se have been described in four general categories: "imputation of (1) certain indictable crimes, (2) loathsome disease, (3) incompetence in occupation, and (4) unchastity." *Barreca v. Nickolas,* 683 N.W.2d 111, 116 (Iowa 2004).

■ "A statement is libelous per quod if it is necessary to refer to facts or circumstances beyond the words actually used to establish the defamation." *Johnson v. Nickerson,* 542 N.W.2d 506, 510 (Iowa 1996). To sustain an action for defamation based on libel per quod, a plaintiff must be able to prove some cognizable injury, such as injury to reputation. *Kiesau,* 686 N.W.2d at 175. In an action based on libel per quod, a plaintiff must show damage other than just hurt feelings. *Id.; Schlegel,* 585 N.W.2d at 222 ("In case of statements that are not libelous per se but libelous per quod, this means a plaintiff must first prove actual damage to reputation before the plaintiff can recover for mental anguish or hurt feelings.").

Clover's statements regarding Garwood's alleged breach of the NCA do not directly attack Garwood's integrity or moral character and therefore lack the earmarks of libel per se. First, the statements Garwood complains of do not fit any of the aforementioned categories described

by the Iowa Supreme Court in *Barreca v. Nickolas,* 683 N.W.2d at 116. Second, the statements "viewed stripped of any pleaded innuendo" are not libelous. The allegedly defamatory statements contained in the September 12 and 24 letters informing Whitlock that Mechdyne believed Garwood was in breach of his NCA "taken alone," are not attacks on Garwood's integrity or moral character. Third, Garwood conceded, if not argued, at oral argument and in briefing that the statements are couched in terms of the NCA but must be examined under the circumstances surrounding Garwood's departure from Mechdyne; and thus by Garwood's own admission the Court must necessarily rely on innuendo to determine the statements' meanings. Based on the foregoing factors, by definition, the statements are not libelous per se. *See Shaw,* 245 N.W. at 233. The Court will analyze the allegedly defamatory statements under the libel per quod standard, and therefore Garwood must be able to prove some cognizable injury beyond just hurt feelings. *See Kiesau,* 686 N.W.2d at 175.

### 2. Prima Facie Case of Libel Per Quod

■ To demonstrate a prima facie case of libel per quod, Garwood must show (1) Mechdyne published a statement; (2) the statement was defamatory; (3) the statement was "of and concerning" the plaintiff; and (4) the statement resulted in injury to the plaintiff. *Schlegel,* 585 N.W.2d at 221.

■ To prove defamation, the plaintiff ordinarily must show the statements "were made with malice, were false, and caused damage." *Id.* Substantial truth is a complete defense to a defamation action. *Behr v. Meredith Corp.,* 414 N.W.2d 339, 342 (Iowa 1987). "[A] libel defendant is not required to establish the literal truth of the publication in every detail as long as the 'sting' or 'gist' of the

defamatory charge is substantially true." *Id.* "The gist or sting of the defamatory charge, according to one court, is 'the heart of the matter in question—the hurtfulness of the utterance.'" *Id.* (quoting *Vachet v. Cent. Newspapers, Inc.*, 816 F.2d 313, 316 (7th Cir.1987)). "If the underlying facts as to the gist or sting of the defamatory charge are undisputed, the court may determine substantial truth as a matter of law." *Id.*

■ The Iowa Supreme Court has adopted the following four-factor test for the trial court to use in determining whether the challenged statement is defamatory: (1) "the precision and specificity of the disputed statement"; (2) "'the degree to which the [alleged defamatory] statements are ... objectively capable of proof or disproof [ ]'"; (3) "the context in which the alleged defamatory statement occurs"; and (4) "'the broader social context into which [the alleged defamatory] statement fits.'" *Yates,* 721 N.W.2d at 771–72 (quoting *Jones v. Palmer Commc'n, Inc.,* 440 N.W.2d 884, 891–92 (Iowa 1989), *overruled on other grounds by Schlegel,* 585 N.W.2d at 224).

### 3. Clover's September Letters to Patrick

Garwood argues the following statements contained in Clover's September 12 letter to Whitlock constitute defamation: (1) "to the extent possible, Mr. Garwood intends to do what he can to circumvent the spirit and intent of the NCA"; (2) "[Garwood] could not possibly carry out his role without disclosing Mechdyne trade secrets, confidential information, knowledge, know-how, marketing plans and strategies, pricing strategies, or other subject matter pertaining to Mechdyne's business"; (3) "[Garwood was] hired by Mechdyne with absolutely no knowledge, skill, know-how, or information related to audiovisual, broadcast and control room envi-

ronments"; and (4) "[Mechdyne] has direct knowledge that Mr. Garwood has already attempted to solicit Mechdyne employees to leave our company and go to work at Whitlock." Garwood also asserts the following statement in Clover's September 24 letter to Whitlock was defamatory: "We have been informed by certain of our customers that Mr. Garwood has contacted them either as he was leaving and/or after he resigned his position at Mechdyne. This is a direct violation of the NCA Paragraph 1."

For purposes of summary judgment, Mechdyne concedes Clover's statements contained in the September letters were made to a third party—Patrick—and therefore Garwood can demonstrate the publication element of a prima facie claim of defamation. Mechdyne argues Garwood's defamation claim as to these statements nonetheless fails because the statements contained in the September letters were substantially true and entitled to qualified privilege.

### a. Statements are Substantially True

■ "A trial court's initial task in a defamation action is to decide whether the challenged statement is 'capable of bearing a particular meaning, and whether that meaning is defamatory.'" *Yates,* 721 N.W.2d at 771–72 (quoting Restatement (Second) of Torts § 614(1)).

> In carrying out this task, a court should not, however, "indulge far-fetched interpretations of the challenged publication. The statements at issue 'should ... be construed as the average or common mind would naturally understand [them].' If the court determines that a statement is indeed capable of bearing a defamatory meaning, then whether that statement is in fact 'defamatory and false [is a question] of fact to be resolved by the jury.'"

*Id.* at 772 (quoting *Guilford Transp. Indus., Inc. v. Wilner,* 760 A.2d 580, 594 (D.C.2000) (internal citation omitted in original)).

The Iowa Supreme Court has "adopted the view espoused in Restatement (Second) of Torts, section 581A comment *f,* that if an allegedly defamatory statement is substantially true, it provides an absolute defense to an action for defamation." *Id.* at 768–69 (internal quotation omitted). Comment *f* states, in pertinent part, "many charges are made in terms that are accepted by their recipients in a popular rather than a technical sense. . . . It is not necessary to establish the literal truth of the precise statement made. Slight inaccuracies of expression are immaterial provided the defamatory charge is true in substance." Restatement (Second) of Torts § 581A cmt. f (1977).

 Viewing Clover's letters in context of the circumstances in which they were written and in light of information known or believed by Mechdyne at the time they were written, the Court finds the following information was known to Mechdyne at the time Clover made the statements:

1. Garwood contacted Whitlock while still employed by Mechdyne;

2. Mechdyne was an occasional competitor to Whitlock prior to the fall of 2008;

3. In his September 11 letter, Patrick acknowledged that Whitlock and Mechdyne "occasionally vie for the same contracts";

4. In August 2008, one month before leaving Mechdyne, Garwood began interviewing with Whitlock;

5. Whitlock offered Garwood employment on August 19, 2008;

6. Garwood copied Mechdyne's proprietary information, including Mechdyne's customer list, onto an external hard drive; [6]

7. On September 8, Mechdyne employee Ryan Torrey advised Mechdyne that Garwood encouraged Torrey to look at employment with Whitlock; [7]

8. Garwood gave Mechdyne his official resignation on September 10;

9. Garwood began working at Whitlock on September 11;

10. On September 15, Garwood advised Mechdyne that he was returning all "equipment, files, and data that has come to be in [his] possession while during [sic] my tenure with Mechdyne";

---

**6.** Although there is a dispute of fact regarding "why" the files were copied to an external hard drive and "who" may have provided Garwood assistance in copying the information, those facts are not material. The material and undisputed facts show that Mechdyne knew Garwood had an external hard drive containing Mechdyne's proprietary information and that Garwood had not returned that hard drive when he resigned his position at Mechdyne.

**7.** Garwood's assertion that Torrey, not Garwood, initiated the discussion regarding opportunities at Whitlock may be relevant and material to other issues in this case, but it is immaterial as it relates to Mechdyne's information and belief on September 24 when

Clover made the statement in the letter to Patrick regarding Garwood encouraging other Mechdyne employees to seek employment at Whitlock. The undisputed facts show Clover made the challenged statement after receiving Torrey's September 8 email. Garwood has not produced any contrary evidence demonstrating Mechdyne knew or had reason to know the information Torrey volunteered was untrue *and* Mechdyne knew it was not true *on September 24* when Clover sent the letter to Patrick. Accordingly, information Mechdyne learned at a later time, including during discovery of this litigation, is not relevant to the issue of Mechdyne's knowledge when the allegedly defamatory statements were made.

11. Wade informed his supervisor on September 18 that a Mechdyne client informed Wade that Garwood had contacted that Mechdyne client and Garwood had given the client his new cell phone number.

On September 10, 2008, the day Garwood resigned from Mechdyne, Clover sent a letter to Patrick, Whitlock's COO, informing Patrick that Mechdyne believed Garwood's employment with Whitlock constituted a breach of the NCA. Patrick responded on September 11, opining that Whitlock did not believe Mechdyne's NCA was enforceable but that Whitlock would nonetheless not put Garwood in a position where he would be directly competing for or soliciting Mechdyne customers with whom Garwood had previously worked. On September 12, Clover responded to Patrick's letter, detailing Garwood's conduct that Clover believed breached Garwood's NCA. Twelve days later, Clover had not heard from Patrick and sent a third letter, reaffirming his previously established position and adding information regarding Garwood's contact with Mechdyne employees.

Considering the allegedly defamatory statements, the Court cannot find these statements are untrue in substance. The statements constitute nothing more than Clover's defense of Mechdyne's rights under Garwood's NCA, and Clover's conclusions and expectations based upon the foregoing information. Garwood's disagreement with Clover's interpretation of the NCA does not transform the statements into libel. The record before the Court fails to demonstrate that the statements received by Patrick injured Garwood's reputation. To the contrary, in a letter dated October 21, 2008, Patrick responded to Clover's September 24 letter repeating his opinion that the NCA was unenforceable and asserting that Whitlock was "fully prepared to defend [its] legal right to employ Mr. Garwood, honoring the commitments we have made herein." Mechdyne's App. 55.

### b. Statements are Entitled to Qualified Privilege

Mechdyne also argues the September 2008 letters are privileged, and therefore even if any of the statements therein could be construed as untrue and defamatory, they are not actionable. *See Lyons v. Midwest Glazing, L.L.C.,* 235 F.Supp.2d 1030, 1046 (N.D.Iowa 2002) ("[T]he law recognizes that circumstances may arise when a person, in order to protect his or her own interest or the interest of others, must make statements about another which are defamatory or defamatory per se, and in such circumstances a qualified privilege bars liability.").

A qualified privilege exists with respect to statements that are otherwise defamatory if the following elements exist: (1) the statement was made in good faith, (2) the defendant had an interest to uphold, (3) the scope of the statement was limited to the identified interest, and (4) the statement was published on a proper occasion, in a proper manner, and to proper parties only.

*Barreca,* 683 N.W.2d at 119. *See also Thompto v. Coborn's, Inc.,* 871 F.Supp. 1097, 1126 (N.D.Iowa 1994) (same). "A qualified privilege is abused, for example, when a defamatory statement is published with 'actual malice.'" *Barreca,* 683 N.W.2d at 118.

The Iowa Supreme Court has "abandon[ed] the old common law 'improper purpose' definition of 'actual malice' in favor of the *New York Times [v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)] test, which focuses upon whether the defendant published the statement with a knowing or reckless disregard of its truth." *Id.* at 123.

[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication [T]he actual malice standard require[s] a high degree of awareness of . . . probable falsity.

*Id.* (quoting *Caveman Adventures UN, Ltd. v. Press–Citizen Co., Inc.*, 633 N.W.2d 757, 762 (Iowa 2001), *abrogated on other grounds by Barreca*, 683 N.W.2d at 121).

"[I]n the employment context, the qualified privilege is the only effective means of preventing every termination decision from automatically becoming a case of defamation. 'It is in the public interest that information regarding an employee's discharge be readily available to the discharged employee and to prospective employers, and we are concerned that, unless a significant privilege is recognized by the courts, employers will decline to inform employees of reasons for discharges.' "

*Sykes v. Hengel*, 394 F.Supp.2d 1062, 1077 (S.D.Iowa 2005) (internal citations omitted) (quoting *Theisen*, 636 N.W.2d at 85 (quoting *Lewis v. Equitable Life Assur. Soc'y of the U.S.*, 389 N.W.2d 876, 889–90 (Minn. 1986))). Under Iowa law, the Court determines whether "the occasion of [Clover's] statements was qualifiedly privileged; if the occasion was so privileged, it must then be determined whether that privilege was abused." *Barreca*, 683 N.W.2d at 118.

Considering the appropriate factors in determining whether a qualified privilege applies, the record demonstrates Mechdyne's statements in the September letters were (1) made to protect Mechdyne's business interests; (2) communicated to Patrick, who was the proper party; (3) communicated immediately after Garwood began working for Whitlock, which was

the proper occasion; (4) communicated via letters, which was the proper manner; (5) limited in scope to the identified interest of enforcing the NCA; and (6) based on information known to Clover at the time they were made. Given these circumstances, and as discussed more fully below, the record generates no material fact issue that the communications were made other than in Clover's good faith belief of the enforceability of the NCA. Thus, a qualified privilege is generated.

Therefore, to defeat a qualified privilege defense, Garwood must show that Mechdyne "acted with knowing or reckless disregard of the truth of the statement[s]." *See Barreca*, 683 N.W.2d at 121. Demonstrating a "wrongful motive" is not enough. *Id.*

Garwood argues Mechdyne is not entitled to qualified privilege because "a fact question exists as to whether Clover's communications had more to do with personal spite associated with a decision by a top salesman and 'superstar' to move on from Mechdyne." Garwood Br. at 8. Garwood asserts that "actual malice is plain in Clover's communications"; Garwood, however, fails to present a legal argument how any of the disputed statements demonstrate a reckless disregard for the truth. Similarly, Garwood's other assertions that (1) various statements in the letters are "substantially not true," (2) had Clover done "the slightest investigation" he would have discovered "the circumstances under which the alleged communications were taking place," and (3) Clover "heatedly" sent off letters to Whitlock, fall short of the requisite showing that Clover acted with a reckless disregard for the truth.

At most, Garwood's arguments suggest Clover acted out of resentment because Garwood resigned from Mechdyne. Even if the Court accepts that assertion as true,

resentful conduct fails to meet the requisite showing of actual malice. *See Chapman v. Labone,* 460 F.Supp.2d 989, 1004 (S.D.Iowa 2006) (applying Iowa law and finding defendants were entitled to qualified privilege for allegedly defamatory statements released in a report because the facts alleged did not demonstrate the defendant acted with the requisite knowing or reckless disregard for the truth, and therefore the plaintiff failed to make the requisite showing of actual malice to survive summary judgment). The statements made in the September letters do not demonstrate Clover acted with actual malice, and therefore Mechdyne is entitled to a qualified privilege regarding the statements made in those letters.

### 4. Clover's November 12, 2008, Memorandum to Mechdyne Employees

Garwood argues the November 12, 2008, memorandum Clover sent to Mechdyne employees also contained defamatory statements. The November 12 memorandum advised Mechdyne employees that Mechdyne had filed a lawsuit against Garwood to enforce the NCA and "to seek redress for the fact that, according to a forensic computer expert, [Garwood] copied and took with him a large amount of [Mechdyne]-critical data including a complete Mechdyne customer list, customer proposals . . . , and FY09 sales strategic plans." Mechdyne's App. 58. Clover advised Mechdyne employees not to discuss the pending litigation and asked them to notify management if Garwood contacted them.

Garwood argues the following statements in the November 12 memorandum were either untrue or were designed to portray Garwood in a negative light: (1) "[Garwood] copied and took with him Mechdyne information," (2) "We can think of no reason this information would have been taken other than for the purpose of

competing with us," (3) Garwood's intentions for taking employment with Whitlock "were not as represented," and (4) "[Garwood] had been a friend of mine for the last 18 years."

Mechdyne argues these statements are not actionable because (1) the memorandum was only sent to Mechdyne employees, and therefore was not published to a third party outside the dispute; and (2) no statements therein could be construed as an attack upon Garwood's integrity or moral character, expose Garwood to public hatred, contempt, or ridicule, deprive Garwood of the benefits of public confidence and social dealings, or injure Garwood in the maintenance of his business. *See Kiesau,* 686 N.W.2d at 174 (listing the elements of a defamation claim). Mechdyne further argues that the November 12 memorandum is entitled to qualified privilege.

Garwood asserts Mechdyne sent the November 12 memorandum to an independent contractor, and that therefore it was published. Garwood further asserts Mechdyne provides no legal authority for the assertion that an intraoffice memorandum that only Mechdyne employees saw is not a publication. Garwood does not deny that he accessed Mechdyne's computer files and does not dispute that Hughes found evidence of the files Garwood created or that Clover's statements were based on that information; rather, Garwood suggests Clover should have couched these statements in a light more favorable to Garwood.

At the hearing, Mechdyne clarified that the November 12 memorandum was sent to Mechdyne employees and Malcolm Green, an independent contractor salesman for Mechdyne. Thus, the November 12 memorandum was provided to persons within the internal business operations of Mechdyne and thus was an internal com-

pany communication. Even if the Court assumes *arguendo* that the November 12 memorandum was published for purposes of showing a prima facie case of defamation, Garwood's claim fails because Garwood does not allege, let alone demonstrate, that the statements in the November 12 memorandum were made with malice, false, or caused injury. *See Schlegel,* 585 N.W.2d at 221.

### a. Substantially True

■ First, Garwood complains that Clover could have verified with Struebing *why* Garwood backed up the files to his external hard drive. This argument is irrelevant as to the truthfulness of Clover's statement that Garwood "copied" Mechdyne's files to an external hard drive. Furthermore, Hughes indicated in his report that Garwood "copied" the files and that therefore Clover was merely repeating the finding of the forensic expert. Second, the first three alleged defamatory statements in the November 12 memorandum, when read in context of the circumstances, are supported by Hughes' report. Third, the challenge that the statement Clover and Garwood had been friends for eighteen years was "untrue and at best, an extreme exaggeration," Garwood Br. at 15, finds no support in fact or in the law of defamation in that the statement provides Clover's view of the relationship; furthermore, there is nothing in the statement that even suggests malice. In addition, Garwood has not alleged how such a statement damaged his reputation as required by Iowa law to maintain a claim of libel per quod. *See Kiesau,* 686 N.W.2d at 175.

Mechdyne has demonstrated that the statements contained in the November 12 memorandum were substantially true, and therefore those statements are not actionable. *See Yates,* 721 N.W.2d at 771–72.

### b. Qualified Privilege

■ As with the allegedly defamatory statements in the September letters, as-

suming *arguendo* the statements were defamatory, Mechdyne is entitled to qualified privilege. The statements in the November 12 memorandum were made to protect Mechdyne's pecuniary interests, they were limited to informing and instructing the Mechdyne employees and salespersons regarding the pending lawsuit against Garwood, and they were sent via an internal memorandum to current Mechdyne employees and salespersons days after the lawsuit was filed. In all respects, the November 12 memorandum satisfies the test for qualified privilege. *See Barreca,* 683 N.W.2d at 119.

### 5. January 12 and 14, 2009, Letters Between Counsel

■ Mechdyne next asserts the letters of January 12, 2009, and January 14, 2009 (the litigation letters), between Mechdyne's attorneys and Garwood's attorney did not contain defamatory statements, were sent after litigation commenced, and are protected. Garwood concedes that these letters are not part of his defamation claim but maintains that they are part of his interference claim.

To the extent Garwood has not conceded this point, his claim is foreclosed because under Iowa law such communications are protected. *See Asay v. Hallmark Cards, Inc.,* 594 F.2d 692, 697 (8th Cir.1979) (applying Iowa law).

> Iowa law recognizes a narrow privilege with respect to certain utterances made in connection with judicial proceedings and emphasizes the presence of judicial control. Iowa accepts the position of the Restatement of the Law of Torts, § 586, which states:
>
>> An attorney at law is absolutely privileged to publish false and defamatory matter of another in communications preliminary to a proposed judicial proceeding, or in the institution of, or

during the course and as a part of a judicial proceeding in which he participates as counsel, if it has some relation thereto.

*Id.* (quoting *Johnston v. Cartwright,* 355 F.2d 32, 36–37 (8th Cir.1966)).

The litigation letters exchanged between counsel for Mechdyne and Garwood are privileged and cannot form the basis of a defamation claim.

### C. Intentional Interference with Contract Claim

■ Mechdyne next argues it is entitled to summary judgment on Garwood's intentional interference with contract claim, arguing that Garwood did not have a contract with Whitlock, Garwood cannot establish that any actions taken by Mechdyne were improper, and Garwood did not suffer any damages as a result of the alleged interference with contract.

■ Garwood counters that his at-will status with Whitlock does not preclude a claim of intentional interference with contract. *See Toney v. Casey's Gen. Stores, Inc.,* 372 N.W.2d 220, 222 (Iowa 1985) ("The only question remaining is whether recovery should be barred where the injured contractual relationship is at will. We see no reason for barring recovery on such a basis."). Garwood also contends fact questions exist whether Defendants acted with an improper purpose. Specifically, Garwood challenges the reasonableness of the NCA as it compares with Whitlock's non-compete agreement and argues Mechdyne's enforcement of the unreasonable NCA makes its conduct improper. Garwood also argues summary judgment is precluded by several remaining fact questions regarding why Whitlock terminated Garwood. Garwood points to instances where Mechdyne allegedly tried to "lure" employees from competitors in an attempt to interfere with their contractual relationships as evidence of Mechdyne's

propensity to interfere with contractual relationships. Garwood also asserts he was damaged because Mechdyne's interference caused Whitlock to terminate him, which resulted in Garwood losing salary and commission.

To recover for intentional interference with an existing contract, a plaintiff must show:

> (1) plaintiff had a contract with a third-party; (2) defendant knew of the contract; (3) defendant intentionally and improperly interfered with the contract; (4) the interference caused the third-party not to perform, or made performance more burdensome or expensive; and (5) damage to the plaintiff resulted.

*Kern v. Palmer Coll. of Chiropractic,* 757 N.W.2d 651, 662 (Iowa 2008) (quoting *Green v. Racing Ass'n of Cent. Iowa,* 713 N.W.2d 234, 243 (Iowa 2006)).

■ In determining whether Clover's conduct is improper, the following factors are relevant:

> (a) the nature of the act or conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the interest sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interest of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.

*Jones v. Lake Park Care Ctr.,* 569 N.W.2d 369, 377 (Iowa 1997) (quoting *Hunter v. Bd. of Trs.,* 481 N.W.2d 510, 518 (Iowa 1992)).

The Iowa Supreme Court has also observed:

> In determining whether the interference is improper, it may become very important to ascertain whether the actor was

motivated, in whole or in part, by a desire to interfere with the other's contractual relations. If this was the sole motive the interference is almost certain to be held improper [I]f there is no desire at all to accomplish the interference and it is brought about only as a necessary consequence of conduct of the actor engaged in for an entirely different purpose, his knowledge of this makes the interference intentional, but the factor of motive carries little weight toward producing a determination that the interference was improper.

*Berger v. Cas' Feed Store, Inc.*, 543 N.W.2d 597, 599 (Iowa 1996).

 "A party to a contract cannot be liable for tortious interference with that contract. Only a third-party, separate from the contracting parties, can be liable for such a tort." *Jones*, 569 N.W.2d at 378. "[An individual's] status as an employee of [the employer] does not ipso facto make him a party to any contracts [the employer] might enter, employment or otherwise." *Hunter*, 481 N.W.2d at 518; *cf. Klooster v. N. Iowa State Bank*, 404 N.W.2d 564, 569–70 (Iowa 1987) (holding that a tortious interference claim cannot occur when there is no third party involved and if jury determined the bank acted wrongfully, the plaintiffs had an adequate remedy for breach of contract or abuse of process).

 Garwood has failed to demonstrate the necessary elements of the tort of intentional interference with contract. First, it is undisputed Garwood was an at-will employee at Whitlock. While Iowa courts do recognize a cause of action for intentional interference even though the contract at issue is terminable at will, the courts "require substantial evidence that the defendant's predominate or sole motive of the interference was to damage the plaintiff." *Condon Auto Sales & Serv., Inc. v. Crick*, 604 N.W.2d 587, 601 (Iowa 1999). As discussed above in reference to Garwood's defamation claim, this record demonstrates Mechdyne's actions in contacting Whitlock were based at least in substantial part on Mechdyne's interest to enforce the NCA, making the high threshold of "predominate motive" unsustainable as a matter of law. Garwood's assertions regarding the reasonableness of Mechdyne's NCA as compared to Whitlock's non-compete agreement are not material to the intentional interference with contract inquiry. Furthermore, and contrary to Garwood's assertion, Patrick made it clear that he terminated Garwood after Garwood admitted emailing or transferring Mechdyne's information onto Whitlock's computer. Therefore, Garwood has failed to demonstrate Mechdyne's conduct interfered with his contract with Whitlock. Because Garwood has not demonstrated the other necessary elements of the tort of intentional interference with contract, the Court does not address whether Garwood suffered damages.

## D. Oral Motion to Amend

 At the August 13, 2009, motion hearing, Garwood made an oral motion to amend his counterclaim and third-party complaint. *See* Fed.R.Civ.P. 15(a)(2) (providing that after a responsive pleading has been filed, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires"). Garwood's counsel indicated at the hearing that the proposed amendment would add a claim for intentional interference with prospective business relations based on Mechdyne's intention to inform CyViz of Garwood's NCA and Mechdyne's intention to enforce the NCA. Mechdyne defended that CyViz is also a competitor of Mechdyne, and therefore Clover is within its right to send such a letter.

Because of the only prospective nature of the relationship subject to possible interference, this additional tort stringently requires that a defendant have acted with "the sole or predominant purpose to injure or financially destroy the plaintiff." *See, e.g., Compiano v. Hawkeye Bank & Trust of Des Moines,* 588 N.W.2d 462, 464 (Iowa 1999). Therefore, the Court finds that the proposed amendment would suffer the same legal deficiencies as Garwood's intentional interference with contract claim and would therefore be futile. Accordingly, Garwood's oral motion is denied. *See Roberson v. Hayti Police Dep't,* 241 F.3d 992, 995 (8th Cir.2001) (holding that even under Rule 15(a)'s liberal amendment policy, denial is appropriate when futility of the amendment can be demonstrated).

## III. CONCLUSION

For the reasons stated, Mechdyne and Chris Clover's motion for summary judgment (Clerk's No. 40) must be **granted;** the counterclaims against Mechdyne are **dismissed;** and the third-party action against Chris Clover is **dismissed.**

**IT IS SO ORDERED.**